946 So.2d 316 (2006)
STATE of Louisiana In The Interest of C.M., H.W., JR., and L.B., Plaintiffs-Appellees
v.
Chiquita WILLIS, Defendant-Appellant.
No. 41,908-JAC.
Court of Appeal of Louisiana, Second Circuit.
December 27, 2006.
John B. Smitherman, for Chiquita Willis.
Glen Mangham, Assistant District Attorney, for State of Louisiana, Doss.
Eugene Golden, for C.M., H.W., Jr., and L.B.
John W. Wilson, Shreveport, for Harold Willis, Sr.
Wilbert D. Pryor, for Lemale James.
Before STEWART, GASKINS and MOORE, JJ.
STEWART, J.
In this juvenile court proceeding, guardianship of three children was awarded to their maternal grandmother. The children's mother appeals the ruling on the grounds that the trial court erred in allowing the discontinuance of reunification efforts without proof that such efforts were not required and that the placement was *317 not shown to be either in the children's best interests or the least restrictive disposition. For the following reasons, we affirm the juvenile court's judgment.

FACTS
C.W. is the mother of three boysC.M. (age 16), H.W. (age 14), and L.B. (age 11). The Louisiana Department of Social Services, Office of Community Services ("OCS" or "the department") removed the children from their home on May 28, 2006, in response to reported physical abuse by their mother. The affidavit in support of the instanter order relates that C.W. was "acting crazy." She bit C.M. and H.W. She also beat H.W. with an extension cord and hit him on the head with a bat. Prior to the abusive episode, she told her boys to put furniture in front of the doors, because she feared someone was coming to get them. When H.W. did not act fast enough, she became angry and beat him to make him move faster. The mother was taken to Louisiana State University Medical Center, and the three boys were taken into custody by OCS and placed with their maternal grandmother.
H.W. reported the beatings as an ongoing problem due to anger his mother feels toward his father. Both H.W. and L.B. said they had not attended school for three months. The oldest child, C.M., reported that his mother bit him on his finger when he tried to stop her from beating H.W. To protect his younger brother, H.W., from their mother, C.W. had not finished school and had quit a job to stay home.
The children were adjudicated in need of care at a hearing on July 17, 2006, and they were continued in OCS's custody while residing with their grandmother. The trial judge ordered the mother to undergo a psychiatric evaluation and granted her supervised visits with C.M. and L.B., but not with H.W.
C.W. testified at the hearing regarding the paternity of her sons. She testified that C.M.'s father was deceased. She identified the father of H.W. and gave the name of the man she believed to be the father of L.B.H.W.'s father had already been involved in the proceedings and was allowed reasonable unsupervised visits, including overnight visits, with his son.
Both fathers were present at the dispositional hearing on August 17, 2006. The court appointed an attorney to represent L.B.'s father, who requested a DNA test to confirm paternity. The hearing was then continued to August 23, 2006. When the hearing resumed, two OCS reports were admitted into evidence along with two CASA reports.
The first OCS report of July 7, 2006, related that C.W. had not been cooperative and that the children did not wish to visit their mother. OCS recommended that guardianship of the three boys be given to their maternal grandmother with whom they were residing. Permanency plans for the children, as indicated by their case plans and related reports, included reunification or guardianship with a relative.
The second OCS report on August 16, 2006, indicated that the mother had completed her social assessment, substance abuse assessment, and her court-ordered psychiatric evaluation. She had been referred for parenting classes. C.M. and L.B. had visited her at their grandmother's home, and the visits seemed to be going fine. However, H.W. was not willing to visit her. The report included the same recommendation for guardianship of the children.
The psychiatric evaluation attached to the OCS report did not make any specific recommendation regarding C.W.'s ability *318 to care for her children without resort to physical abuse. In discussing the events that led to the children being removed from the home, C.W. described her son, H.W., as much larger than her and "very oppositional and ungovernable." She admitted biting him twice, though she claimed she felt physically threatened by him and stated that he was trying to kick her leg out from under her. C.W. had one leg amputated after being shot in 1994; she blames the incident on H.W.'s father. The shooting incident led to depression. She was under the care of a psychiatrist from 1998 to 2005, when he moved out of state. Following the incident of May 28, 2006, she was hospitalized for twelve days, diagnosed with Schizoaffective Disorder, and prescribed medications. She was referred to Shreveport Mental Health for services, but she preferred to be followed by a private psychiatrist. She contacted her former psychiatrist, Dr. Islam, who referred her for continued treatment with her primary care doctor. Dr. Islam also discontinued the anti-psychotic medications prescribed to her and informed Shreveport Mental Health that she is not psychotic but suffers from Atypical Depression. C.W. reported that the medications are helping her and that she has much less stress living on her own without having to care for her children. She lives alone in an apartment and supports herself with a disability check. Although she tested positive on a drug-screen for marijuana, she attributed the result to secondhand smoke from friends. The report concluded that C.W. needs to be seen regularly by a psychiatrist and that she would be more likely to participate in treatment if she does not feel forced into it. Because she preferred to see a private psychiatrist, she was given a referral with an appointment set for October 5, 2006.
The CASA report of July 14, 2006, related that the children appeared to be thriving in their grandmother's care where they felt content and secure. Though C.W. was willing to work with CASA, she was uncooperative with OCS and her attorney. She indicated to CASA a willingness to work on her case plan and to visit with C.M. and L.B. However, she did not want to see H.W., and he did not want to see her. CASA related that C.W. began screaming obscenities and hateful words at H.W. when she saw him at her mother's home where the boys reside. She told CASA that she believes he is evil. CASA reported that C.W. blames H.W.'s father for the shooting and takes her anger out on H.W.; however, H.W.'s father has denied involvement in the incident. Although C.W. expressed a desire to reunify with C.M. and L.B., CASA's recommendation was for the boys to be permanently placed under their grandmother's guardianship with scheduled visitations for C.M. and L.B. in another location as C.W. should not be allowed around H.W. CASA's report of August 22, 2006, related to the boys paternity and made the same recommendation that the boys remain with their grandmother.
In addition to the reports admitted into evidence, C.W. called Janet Murray, her caseworker, to testify. Ms. Murray related the steps C.W. had taken toward completing her case plan. Ms. Murray stated that the visits with the boys went fine, but she noted that C.W. had missed the last visit. She also noted that removal of the boys from state custody might adversely impact C.W.'s ability to obtain services beneficial to reunification with her sons. However, Ms. Murray acknowledged on cross examination that C.W. had chosen to seek private psychiatric care.
The trial judge determined that guardianship would be the permanent plan for the boys and granted guardianship to their maternal grandmother until each child's *319 eighteenth birthday. In doing so, the judge rejected the argument of C.W.'s counsel that it was premature to award guardianship. The judge noted that C.W. would not be precluded from following through on her plan and asking the court for custody at a later date. The judgment gave her supervised visitation. C.W. appeals this judgment.

DISCUSSION
On appeal, C.W. argues that the juvenile court judge erred in awarding guardianship of the boys without requiring OCS to show by clear and convincing evidence that reunification efforts were not required as provided by La. Ch. C. Art. 672.1. She further asserts that OCS did not show that reunification efforts had been attempted and either failed or would not be in the children's best interests.
Our review of the juvenile court's permanent placement determination is governed by the manifest error standard. State ex rel. J.B. v. J.B., 35,846, p. 11 (La.App.2d Cir.2/27/02), 811 So.2d 179, 187.
Article 672.1(A) states, "At any time in a child in need of care proceeding when a child is in the custody of the department, the department may file a motion for a judicial determination that efforts to reunify the parent and child are not required." The department must then prove by clear and convincing evidence that reunification efforts are not required. La. Ch. C. art. 672.1(B). Reunification efforts are not required if the court finds the parent(s) subjected the child to egregious conduct or conditions; committed murder or manslaughter of another child of the parent or aided, abetted, attempted, conspired, or solicited the murder or manslaughter; committed a felony that resulted in serious bodily injury to the child or another child of the parent; or had parental rights to a sibling terminated involuntarily. La. Ch. C. Art. 672.1.(C).
C.W. cites State ex rel. A.T., XXXX-XXXX (La.7/6/06), 936 So.2d 79, a termination of parental rights case in which the department made no effort to assist the mother in obtaining housing even though lack of suitable housing was the major obstacle to reunification. In discussing the state's failure to make reasonable efforts to remove the obstacles to family reunification, the supreme court observed:
In fact, Article 672.1 sets out the only circumstances under which reunification efforts are not required and even then, the State must file a motion for a judicial determination that efforts at reunification are not required and prove as much by clear and convincing evidence.
State ex rel. A.T., XXXX-XXXX at p. 8, 936 So.2d at 84.
Neither the facts nor the above-cited passage from State ex rel. A.T., supra, suggests error on the part of the trial court. Article 672.1 permits, but does not require, the state to file a motion for a judicial determination that reunification efforts are not required. State ex rel J.B. v. J.B., 35,846 at p. 3, 811 So.2d at 183. The department did not file such a motion and was not required to do so. Nor did it assert in the various proceedings that reunification efforts were not required due to any of the circumstances set forth in Article 672.1.
In fact, the record shows the efforts made toward reunification, the minimal progress made by C.W. on her case plan, and the lack of progress in correcting the abusive behavior that led to the removal of the boys from her custody. Though C.W.'s mental instability was a factor in the episode of May 28, 2006, the primary reason for removal of the boys was her physical abuse of H.W., which the boys reported as an ongoing problem. Her *320 abuse of the child required the older brother to leave both school and a job to protect H.W. from their mother. The record shows no progress by C.W. in recognizing or controlling her seemingly irrational animosity toward H.W. Instead, her mental health evaluation shows that she rationalized her abusive actions by casting blame on H.W. for the incident that led to the boys' removal from her custody. In working her case plan, C.W. expressed to CASA her unwillingness to see H.W., and her feelings toward this child led CASA to conclude that he would be in danger in her presence. The psychiatric care provided C.W. thus far has not resulted in any apparent improvement in her attitude toward H.W., nor does the record indicate that she desires to have a relationship with this son. This is a significant factor favoring the judgment of the juvenile court judge.
We are not persuaded by the argument that it would be a hardship on C.W. if forced to pursue the services required by her case plan without assistance by the state. She rejected such assistance by choosing private psychiatric care rather than availing herself of services offered by Shreveport Mental Health which could have been provided to her in a more expedient manner. This choice reflects her ability to utilize her resources to obtain needed care and services
C.W. also argues that granting guardianship of the children to her mother runs afoul of La. Ch. C. Art. 683, which requires the court to impose the least restrictive disposition available under the circumstances. She asserts that guardianship is one of the most severe alternatives for placement and suggests that the court should have continued the children in the custody of a relative while efforts to reunify the family continued.
La. Ch. C. Art. 683 directs the court to impose the least restrictive disposition of the alternatives set forth in Article 681, which the court finds consistent with the circumstances of the case, the health and safety of the child, and the best interest of society. A preference for placement with a relative is indicated by Article 683(B).
La. Ch. C. Art. 681 provides that the child's health and safety is the paramount concern when there has been an in need of care adjudication and lists the following dispositional alternatives:
 Custody with a parent or other suitable person;
 Custody with a private or public institution or agency;
 Commitment of a mentally ill child to an institution;
 Guardianship to an individual; or
 Some other disposition or combination of the above that is in the child's best interest.
The 1991 Comment to Article 681 indicates that the alternative of guardianship is a "permanent placement" which will eliminate the need for further periodic case reviews or dispositional reviews. The definition of "permanent placement" in La. Ch. C. Art. 603(15) includes placement with a legal guardian.
Also with regard to placement, La. Ch. C. Art. 702, which governs permanency hearings, lists the placement priorities as:
 Return to the legal custody of the parent(s);
 Adoption;
 Placement with a legal guardian;
 Placement in the legal custody of a relative; and
 Placement in the least restrictive, most family-like alternative permanent living arrangement.
This article requires the court to determine whether reasonable efforts have been *321 made to reunify the family or to finalize placement in an alternative safe and permanent home while considering the child's health and safety as the paramount concern in determining his permanent plan. La. Ch.C. art. 702(E). The court is directed to consider the child's need for continuing contact with any relative with whom the child has an established and significant relationship as a factor in determining the permanent plan that is most appropriate and in the child's best interest. La. Ch. C. Art. 702(D).
In the judgment, the juvenile court judge determined that guardianship would be the permanent plan and the least restrictive disposition considering the children's heath, safety, and best interests. We find no error in this determination and no merit to C.W.'s arguments. Our review of the record and judgment shows that the trial court considered the best interests of the three boys and whether reasonable efforts were made to reunify the family in determining that guardianship should be awarded to the maternal grandmother in whose care the boys had remained since being removed from their mother's home on May 28, 2006. Determination of a permanent placement occurred a relatively short time from the in need of care adjudication, but the Children's Code allows disposition hearings to be conducted immediately after adjudication and mandates that they be conducted within thirty days thereafter. La. Ch. C. art. 678. As previously noted, guardianship is a dispositional alternative under La. Ch. C. Art. 681 and considered a permanent placement. Thus, a permanent placement may be determined in a short time frame if in the best interests of the children.
The record establishes that the boys are thriving in their grandmother's care and that they feel safe and secure with her. Their close relationship to their grandmother is an important factor favoring the court's disposition. The three boys share a close sibling relationship, and guardianship will preserve this important bond. While C.W. has visited C.M. and L.B. and expressed the desire to be reunited with them, she has not expressed interest in salvaging her relationship with H.W. Her attitude toward her children evidences disregard of their love for one another. This attitude and her tendency to project whatever anger she feels for H.W.'s father toward H.W. provides additional support for finding that further reunification efforts would be futile. While under their grandmother's guardianship, C.M and L.B. will have the opportunity to preserve their bond with their mother through supervised visits, H.W. will be protected from her animosity and abuse, and the three brothers will not be separated.

CONCLUSION
Finding no error in the juvenile court's judgment making guardianship with the maternal grandmother the permanent placement for C.M., H.W., and L.B., we affirm the court's ruling. Costs of appeal are assessed to the appellant.
AFFIRMED.