GARRETT, J.
In these three consolidated cases, the mother of three minor female children appeals a trial court judgment granting guardianship of the children to the godparents of the two oldest children, who have been the foster parents for all three children, as their permanent placement. We affirm.
FACTS
The children at issue are IP (DOB 2/9/11), KC (DOB 6/21/13), and KP (DOB 8/14/15). Their mother (DOB 2/28/76) and father (DOB 8/25/86) are apparently not married to each other. While the mother referred to the father as her fiancé in 2013, she was still married to another man. The record does not indicate that the mother has divorced her husband or married the father of these three children.
The two oldest girls, IP and KC, first came into the custody of the Department of Children and Family Services ("DCFS") less than two months after KC's birth. KC, who has Down syndrome, was positive at birth for controlled substances; according to the mother, the medication was prescribed. On August 16, 2013, a home health nurse went to the family's mobile home in Shreveport to check on the baby's weight. The nurse observed a bruise on IP's forehead and IP's sippy cup lying in a puddle of dog urine. She also smelled a strong odor of marijuana in the home. The mother's speech was slurred, and she fell asleep while trying to talk.[1] The police and DCFS were summoned. The parents were arrested, and an oral instanter order removing the girls was issued. An instanter order was signed on August 19, 2013, placing IP and KC in DCFS custody. During the course of the investigation, both parents tested positive for drugs-the mother for opiates and codeine and the father for marijuana.
DCFS verified that both parents had been the subjects of prior valid investigations. The father had a 2012 valid investigation. The mother had five valid investigations *629 between 2003 and 2012. In fact, she had three other daughters from her marriage who had been placed in foster care, and the mother eventually lost custody of them to relatives. See State ex rel. P.A.P. , 44,221 (La. App. 2 Cir. 2/4/09), 4 So.3d 182, in which the granting of guardianship to relatives was affirmed.[2]
The father, who admitted to daily marijuana use, was charged with marijuana possession, use/possession of drug paraphernalia, improper supervision of a minor, and illegal use of a controlled dangerous substance ("CDS") in the presence of persons under 17 years of age. He bonded out of jail after several days.[3] The mother, who admitted a history of polysubstance dependence, remained in jail until early March 2014, due to a parole violation.[4]
Following a hearing on August 21, 2013, the children were continued in care; an order forbidding unsupervised visitation by the parents was issued. On August 26, 2013, the Court Appointed Special Advocate ("CASA") program was appointed to advocate for the children. In September 2013, the girls, who initially had been put in separate foster homes, were placed with their godparents, AK and JK.[5]
A petition to adjudicate the children in need of care ("CINC") was filed. On October 23, 2013, the children were so adjudicated by stipulation. They were continued in their placement with the godparents. The mother was ordered to obtain a second medical opinion before taking any prescribed opiates; the father was prohibited from smoking marijuana or using other illegal substances. At this point, the case plan goal was reunification. At a case review on January 27, 2014, the court found that the girls were still CINC. The court approved a case plan with an amended goal of reunification/guardianship.
Effective April 10, 2014, the mother-who had detoxed during her seven months *630 in jail-was ordered to participate in and follow the rules of Family Preservation Court. These included refraining from drug use, attending treatment, and submitting to random drug testing. In July 2014, the mother successfully completed that program by attending all treatment classes and consistently testing negative.
In the meantime, on April 21, 2013, another case review was held; the children were maintained in custody. On August 6, 2014, a permanency/case review hearing was held. The goal was amended to adoption/reunification. The mother was ordered to continue supervision by the Family Preservation Court. The father was ordered not to use marijuana or associate with anyone who used it. Unsupervised visits with the girls were permitted.
In September 2014, CASA recommended that the godparents be granted guardianship of the girls. However, following a modification hearing on September 22, 2014, the children were returned to their mother's custody. DCFS was ordered to continue supervision for three months. CASA was also ordered to remain in the case. After a case review hearing on November 17, 2014, the trial court ordered that the children continue in their mother's custody, with DCFS supervision terminating on December 17, 2014.[6] In March 2015, CASA was relieved of its appointment, but the court ordered that the case remain open and the disposition remain in effect until the children's respective 18th birthdays, unless otherwise ordered. The protective order prohibiting the father from using marijuana or any illegal drug remained in place.
In August 2015, a third daughter, KP, was born.
On August 24, 2016, DCFS received a report that KC was severely underweight, and had been hospitalized and diagnosed as failure to thrive. At age three, KC was 2'9" but weighed only 21 lbs., 6 oz. She was also nonverbal and unable to walk. On August 26, 2016, KC was placed back in DCFS custody, pursuant to an emergency instanter order. At a hearing on August 31, 2016, the court found that KC was not CINC, and she was returned to the custody of her mother, who was ordered to cooperate with DCFS and submit to drug testing. A random drug test of the mother on September 1, 2016, was positive for methadone and methamphetamine.
On November 22, 2016, the DCFS caseworker assigned to the family went to their home because she had been unable to contact the mother for a week. When she arrived, she found the home to be "unclean" and in "total chaos." The father, who was in the process of moving out, was screaming loudly, distressing the children and making them cry. He told the caseworker that he had had enough, that he was leaving the mother because he was tired of "her lies and deceptions," that the mother was lying about her drug abuse, and that she took 160 pills a month. He also said he would no longer work with the agency. IP, who was five years old, described to the DCFS caseworker a physical confrontation between her parents over a cellphone, in which one-year-old KP was knocked to the floor. IP also told the caseworker that she would "need a new family" because her parents were going to "run away." The mother failed to comply with random drug screening immediately after this incident. The father refused to submit to drug testing, telling the caseworker he would test positive because he had been *631 living in Denver where he smoked marijuana legally.[7] The father's mother picked him up while the caseworker was present. The next day, the mother called the caseworker and told her that the father had returned home. According to the mother, the father always says "he's leaving and always comes back; he's not going anywhere." She also said that he had been diagnosed as bipolar and had been off his medications.[8]
In a report dated November 23, 2016, the DCFS expressed the following specific concerns: (1) the parents' volatile relationship, especially in the children's presence; (2) the mother's failure to always be truthful to the caseworker; and (3) the father's mental health, continuous substance abuse, and noncooperation with the agency.
On December 6, 2016, a hearing was held as to IP and KC.[9] The CASA volunteer testified that, at age three, KC was unable to walk or talk. She had missed numerous medical appointments. KC had not been seen at Shriners Hospital for Children since November 2014; she was "no call/no show" for a June 2015 appointment to determine if she needed splints. She missed 13 of 17 scheduled appointments for outpatient therapy at Willis Knighton Canterbury Square, a facility which assists developmentally delayed children and has an eight-month waiting list. As a result, she was discharged from the program. KC's last known appointment with her former pediatrician was March 23, 2015; between that time and her hospitalization in August 2016, there were three "no call/no show" visits. The clinic of her new pediatrician reported two "no call/no shows" in October and November 2016. Per clinic policy, a third one would result in KC being removed as a patient. KP, the youngest child, had already been dismissed as a patient by this clinic because she was "no call/no show" on her new patient appointment in October 2016. The CASA volunteer's report admitted at this hearing refuted the mother's claims that KC lost weight due to a thyroid condition. The record indicates that KC was diagnosed with hypothyroidism, which typically involves weight gain.
According to the CASA volunteer, IP's kindergarten teacher expressed several concerns about the care IP was receiving. Among these were the fact that she frequently came to school dirty and unbathed, with unwashed hair and unbrushed teeth. Further, she could not recognize her ABCs even though she was halfway through the school year. The CASA report admitted at this hearing also stated that IP had reported to school with numerous bug bites from August to October 2016. Despite the teacher's discussion with the mother, the mother failed to treat the bites. Additionally, IP had not seen a dentist since July 2014.
*632 At the hearing, the mother was confronted about a Facebook live post she made earlier in the day indicating that she would flee the jurisdiction with the children if they were removed. Although she steadfastly denied using illegal drugs, she was unable to present a plausible explanation for testing positive for methamphetamine. At the conclusion of the evidence, IP and KC were placed in DCFS custody. The court ordered an expedited interstate compact home study on the godparents, who were living in Missouri.[10] The court ordered DCFS to provide tutoring and counseling for IP, to attend to KC's medical needs, and to conduct a welfare check on KP. Pursuant to the last order, DCFS obtained a verbal instanter order to remove KP that same day. All three girls were taken from the home at the same time.[11] IP and KP were placed in one foster home; due to her special needs, KC was put in a different one.
At a hearing on December 12, 2016, the trial court found reasonable grounds to adjudicate KP as CINC. After hearing testimony, the court placed all three girls with the godparents. The evidence presented at this hearing established that the mother had not been truthful in her testimony at the December 6, 2016 hearing about her efforts to obtain medical care for her children. The CASA volunteer, a registered nurse at a children's hospital, testified that her review of KC's medical records revealed that the child failed to gain weight over a two-year period and was diagnosed as failure to thrive. Because KC was able to gain weight while hospitalized in August 2016, the doctors believed it was a case of malnourishment. AK, the godmother, testified that after KC was taken into DCFS custody in August 2016, she and her husband were contacted about caring for her. She came to Louisiana but did not attend court due to threats she received from the parents. AK affirmed that she and JK were willing to take care of the children temporarily or permanently. The mother denied that she and the father threatened the godmother. She admitted that she had been diagnosed as a narcissist and stated that she was taking medication for anxiety. PR, the mother's candidate for guardian, testified that she was willing to care for the children until adulthood. She stated that while she had been a certified foster parent, she had stopped because she disagreed with things that had happened while she fostered a baby for two years.[12] Although she said she had known the children since birth, *633 she admitted that she had last seen them a year ago for an hour.
In January 2017, CASA and DCFS reported to the court that the parents had expressed willingness to give custody of KC to the godparents due to their own inability to care for her; however, they wanted to keep the other two girls. DCFS informed the court that since the removal of the children, the mother had missed eight dates with her Active Recovery program in a four-week period. According to DCFS's report, the mother tested positive for oxycodone, noroxycodone, and oxymorphone. DCFS also reported that the father tested positive for methamphetamines, amphetamines, and marijuana on a random drug screen in mid-January 2017.
On February 3, 2017, the state amended its CINC petition for KP to allege the following: (1) on January 27, 2017, the mother was arrested for doctor shopping, in violation of La. R.S. 40:971(B)(1)(i) ; (2) between April 19, 2016, and July 26, 2016, a time when she had custody of her daughters, she obtained and filled fraudulent prescriptions for oxycodone and suboxone ; and (3) the father told a caseworker that he attempted suicide on New Year's Day 2017 by overdosing on "x" pills.
At a hearing on February 21, 2017, the trial court found that KP was CINC. It then conducted a review of IP and KC and a disposition hearing on KP. The mother was called to testify by the state but invoked her Fifth Amendment rights due to her pending criminal charges. Testimony about the criminal charges was given by an agent with the Shreveport Police Department's Office of Special Investigations. The father admitted to recent drug tests that were positive for Xanax and marijuana, as well as his New Year's suicide attempt with ecstasy pills. He stated that he and the mother were still together. While he claimed that he no longer had concern about the mother's drug use, he also remarked that he was surprised she had not "fried her liver already" with all the medications she has taken.
The CASA volunteer reported on the children's continuing improvement in the godparents' care and provided the court with details on each child. IP, who had not yet begun to receive the court-ordered tutoring, had already made significant academic improvement due to AK's assistance and attention. She no longer tested as having special needs but would probably have to repeat kindergarten. KC was able to stand unaided and walk with assistance. She had gotten leg braces at Shriners in St. Louis, Missouri, and was continuing to gain weight. KP had adapted to her new surroundings and was also doing well. AK had arranged to catch up KP's immunizations. While in her mother's care, KP received her two-month immunization shots at age three months and her four-month shots at age eight months. By the time AK took her to the Air Force base pediatrician, KP was eight shots behind schedule; it took three appointments to catch her up. She was also found to be behind on her speech and fine motor skills, requiring speech and occupational therapy. The pediatrician was concerned that she might have a genetic disorder. At the time of the hearing, they were waiting on approval of a referral to a geneticist.
As to the mother's candidate for guardian, a DCFS caseworker testified that no home study was done on PR because she declined, didn't want to be fingerprinted, and had changed her mind. PR testified that the caseworker was slow to contact her, but that she eventually decided to "back off." She conceded that the children had never spent the night at her house but reaffirmed her willingness to take the girls if the trial court needed her to do so.
*634 At the conclusion of the evidence, the trial court placed all three children under the guardianship of the godparents. The court approved a case plan submitted by DCFS. It invited, but did not order, the parents to comply with the plan. No further reviews were set, but the court stated that it would entertain a request for a review in due course.
A detailed judgment granting the guardianship of all three girls to the godparents was signed on March 2, 2017. The judgment ordered guardianship as a permanent plan for the children, remaining in effect until their 18th birthdays, unless otherwise modified by the court. The judgment specifically held that guardianship as a permanent plan was the least restrictive disposition and was consistent with the children's rights, needs, health, safety and welfare. It stated that granting of the guardianship was in the children's best interest because it provided a safe and stable home for them and did not continue them indefinitely in foster care. It further stated that "there is a legitimate purpose and a factual basis to support this disposition/permanent plan as the children cannot be safely returned to the custody of their parents at this time and the children cannot wait any longer for the parents to rehabilitate." Supervised visitation at the discretion of the guardians was ordered for the parents. The guardians were specifically prohibited from returning, placing or giving the children to the parents.
Only the mother appealed.[13] The trial court consolidated KP's case with her sisters' cases for purposes of appeal.
LAW
The health, safety, and best interest of the child shall be the paramount concern in all CINC proceedings. See La. Ch. C. art. 601 ; State in Interest of P.D.J. , 51,027 (La. App. 2 Cir. 8/10/16), 200 So.3d 916, writ denied , 2016-1786 (La. 10/28/16), 208 So.3d 890. More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. State in Interest of P.F. , 50,931 (La. App. 2 Cir. 6/22/16), 197 So.3d 745 ; State in Interest of P.B. , 49,668 (La. App. 2 Cir. 12/17/14), 154 So.3d 806.
La. Ch. C. art. 681 provides, in relevant part:
A. In a case in which a child has been adjudicated to be in need of care, the child's health and safety shall be the paramount concern , and the court may do any of the following:
...
(4) Grant guardianship of the child to a nonparent.
(5) Make such other disposition or combination of the above dispositions as the court deems to be in the best interest of the child . (Emphasis added.)
According to La. Ch. C. art. 683, the court shall impose the least restrictive disposition of the alternatives enumerated in Article 681 which the court finds is consistent with the circumstances of the case, the health and safety of the child, and the best interest of society.
Permanent placement is defined in the Louisiana Children's Code as: (1) return of the legal custody of a child to his parent(s); (2) placement of the child with adoptive parents pursuant to a final decree of adoption; or (3) placement of the child with a legal guardian . La. Ch. C. art. 603(22).
*635 La. Ch. C. art. 702 provides, in relevant part:
C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
(1) Return the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.
(2) Adoption.
(3) Placement with a legal guardian . (Emphasis added.)
The Louisiana Children's Code allows disposition hearings to be conducted immediately after adjudication and mandates that they be conducted within 30 days after adjudication. La. Ch. C. art. 678. Guardianship is a dispositional alternative under La. Ch. C. Art. 681 and considered a permanent placement. Thus, a permanent placement may be determined in a short time frame if in the best interest of the children. State ex rel. C.M. v. Willis , 41,908 (La. App. 2 Cir. 12/27/06), 946 So.2d 316, writ denied , 2007-0190 (La. 2/16/07), 949 So.2d 413.
The purpose of guardianship is to provide a permanent placement for children when neither reunification with a parent nor adoption has been found to be in their best interest; to encourage stability and permanence in the lives of children who have been adjudicated to be in need of care and have been removed from the custody of their parent; and to increase the opportunities for the prompt permanent placement of children, especially with relatives, without ongoing supervision by the department. La. Ch. C. art. 718(A).
In order for reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care. La. Ch. C. art. 702(C)(1) ; State in Interest of P.B. , supra . In most permanent plan determinations, the court is required to determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health and safety is the paramount concern in the court's determination of the permanent plan. La. Ch. C. art. 702(E) ; State in Interest of P.B. , supra .
An appellate court's review of a juvenile court's permanent placement determination is governed by the manifest error standard. State in Interest of N.C. , 50,446 (La. App. 2 Cir. 11/18/15), 184 So.3d 760 ; State ex rel. C.M. v. Willis , supra . In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. State in Interest of N.C. , supra ; State ex rel. L.M. , 46,078 (La. App. 2 Cir. 1/26/11), 57 So.3d 518.
Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. State ex rel. L.M. , supra .
*636 DISCUSSION
The mother argues on appeal that the trial court erred in placing the children under guardianship, particularly with guardians who live out-of-state. She contends that the trial court should have formulated another plan of reunification for her and the children. Or, if guardianship was warranted, she asserts that her local candidate should have been named guardian.
The mother also contends that the record does not show, by clear and convincing evidence, that reunification efforts were not required, pursuant to La. Ch. C. art. 672.1. We rejected similar arguments in State ex rel. P.A.P. , supra , and State ex rel. C.M. v. Willis , supra . Here, as in those cases, the state did not-and was not obliged to-file a motion for a judicial determination that reunification efforts were not required. Consequently, the clear and convincing standard was not applicable. Furthermore, throughout these proceedings, reasonable efforts at reunification were made. Unfortunately, due to the conduct of the parents, those efforts were ultimately detrimental to the well-being of the children.
The mother has a long and sad history of neglecting her children. Time after time, DCFS has validated claims of neglect against her. Despite DCFS intervention and multiple drug programs, she has been unable to consistently stay free of drugs and provide for her children's needs over the years. As a result, her young children have suffered. Due to the mother's neglect, IP and KC have had to be placed in foster care twice in their very young lives. Most recently, while in the mother's care, IP frequently went to school dirty, and she tested as having special needs. Her dental health was ignored for almost two years. While in her mother's care, IP was exposed to such tumultuous events that, at the age of only five, she made the truly pitiful and heartbreaking statement to a DCFS caseworker that her parents were going to "run away" and she would need a new family. The substantial medical needs of KC, who has Down syndrome, were neglected by the mother to the point that she required hospitalization and was diagnosed as failure to thrive. Additionally, the mother failed miserably to follow through on numerous medical appointments which would have vastly improved the quality of life for this child with special needs. As a result, at the age of three, KC could not walk or bear weight on her legs. While in the mother's care, KP was knocked to the floor when the parents were physically fighting over a cellphone. The mother's medical neglect of KP caused her to be significantly behind in her immunization. When KP was placed in foster care at the age of 16 months, she already required therapy for speech and fine motor skills.[14]
The mother has a substantial drug history. She lost custody of her three oldest daughters as a result of her drug usage. She was convicted on a charge of drug distribution in 2010. At a hearing in October 2013, after IP and KC were first placed in foster care, she claimed that she had not had alcohol in four years, methamphetamines in five years, or cocaine in seven years. In August 2016, she told a caseworker that she had no mental health issues, did not engage in substance abuse or alcohol, and had not used substances in more than 10 years. Within weeks of making that statement, she tested positive for methamphetamine and methadone. In November 2016, the father informed a DCFS
*637 caseworker that the mother was not being truthful about her drug usage. She was subsequently arrested for illegally procuring prescription drugs by doctor shopping at a time when her three youngest daughters were in her care. As to her mental health, when she testified in December 2016, the mother admitted that she had been diagnosed as a narcissist.
Additionally, the record indicates that the mother's continuing relationship with the father is a matter of concern. Throughout the proceedings, representatives for DCFS and CASA expressed reservations about the appropriateness of the father's behavior around the children. They also expressed doubts as to whether he would stay out of the family home if custody were given to just the mother. Parenting classes taken by the father appeared to have been of only limited use. As demonstrated by the hostile and chaotic episode witnessed by the DCFS caseworker in November 2016, the father's subsequent suicide attempt, and his ongoing drug use and mental health issues, the father continues to lack the stability to safely participate in parenting the children.[15]
The record establishes that the mother has had serious issues with prescription drugs, specifically pain medications, for a lengthy period of time. It also establishes that, although she can sporadically achieve a level of sobriety, she cannot consistently maintain this condition. This inability to remain drug free is detrimental to the welfare of her children, who were not well cared for while living with her. Despite the many interventions over the years, she has not shown significant and lasting improvement indicating that she has benefited from those efforts. Indeed, the fact that she is now facing criminal charges strongly indicates the contrary. There is also evidence that the mother does not accept responsibility for her actions. Instead, she offers a myriad of excuses for her parental failings.[16] Finally, her threat to flee the jurisdiction of the court with the children-which she had the incredibly poor judgment to broadcast on Facebook on the day of a court proceeding-is a matter of grave concern for the girls' safety and well-being. It is not, as portrayed in her appellate brief, merely "an off hand remark implying she would like to just leave." As a result, we cannot find that the mother has made significant and measurable progress to rehabilitate herself and correct the conditions which required the children to be placed in care. Nor is there any reasonable hope that she will do so in the foreseeable future. Accordingly, we find no manifest error in the trial court's decision that guardianship as their permanent placement was in the best interest of *638 the children and was consistent with their rights, needs, health, safety, and welfare.
The mother argues that the trial court erred in not naming her childhood friend PR as the children's guardian because she lived locally in Webster Parish. She contends that would make PR the "least restrictive placement" from the mother's perspective. However, we find that guardianship with the godparents as a permanent placement constitutes the least restrictive disposition, considering the children's health, safety, and best interest.
Although the godparents live out-of-state, the godmother testified that they would bring the girls back to Louisiana to visit as required by the court. In fact, the godmother herself has family here with whom she visits. The godparents have also facilitated the mother's contact with the children through FaceTime video chats.[17] Most importantly, unlike PR, the godparents have a longstanding relationship and a profound emotional connection with the children, as well as a proven track record of providing them with excellent care. The two oldest children flourished during the one-year period they lived with the godparents when they were first taken into foster care. The record shows that since they and their younger sister were placed in the godparents' care in December 2016, all three of them have thrived and excelled. Many of the problems that arose while the children were in the mother's care-IP testing as having special needs, KC being unable to walk, KP being behind in her health care-have been rectified by the diligence and hard work of the godparents. This placement allows all three of these sisters to remain together in a safe and secure environment, a result favored by the jurisprudence. See State ex rel. C.M. v. Willis , supra , in which three brothers were kept together. Accordingly, we find no manifest error in the trial court's decision to keep the children together in the loving and competent care of the godparents, instead of further traumatizing them by handing them over to a virtual stranger.[18] See State in Interest of N.C. , supra , in which this court affirmed an award of guardianship to nonrelated foster parents.
We find that the record fully supports the actions of the trial court. Accordingly, we affirm its judgment placing the children under the guardianship of the godparents as their permanent placement.
CONCLUSION
The trial court judgment placing the children under the guardianship of the godparents is affirmed. Costs are assessed to the appellant.
AFFIRMED.

At a hearing in August 2014, the mother testified that she was "inebriated" on antianxiety medication for postpartum depression.

According to the mother's testimony in the instant proceedings, she married young, and her husband, an abusive alcoholic who used "hard drugs," exposed her to cocaine. She said she worked a case plan on her three oldest daughters, but she had to transfer guardianship because she was on "a little 30 day misdemeanor city jail thing where I couldn't get out."

The father eventually pled guilty to misdemeanor marijuana possession.

While the record does not state the exact charges for which the mother was arrested, she told the trial court in October 2013 that she accepted a plea bargain in Caddo Parish, whereby she pled guilty to a misdemeanor, and two felony charges were dropped. (Based upon her testimony in August 2016, it appears she pled guilty to illegal use of CDS in the presence of persons under 17 years of age.) Due to a parole violation, she was then transferred to the Bossier Parish jail.
The record indicates that the mother had two criminal convictions when the girls were removed in 2013. It is unclear which resulted in the parole violation. At the October 2013 hearing, she stated that she had a 2008 attempted felony theft charge involving a stolen bank card, for which she received a suspended sentence of a year in jail and a year of probation, and that "I only have four months to do on the year." (In State ex rel. P.A.P. , supra , reference is made to her being arrested in 2008 for an unspecified offense.) In the instant record, there are many mentions of a 2010 conviction for distribution of Schedule III hydrocodone in Bossier Parish, for which she received four years of probation. Several DCFS reports indicate that the probation revocation arose from this conviction. There was also testimony that her probation on the distribution charge ended in April 2016.

The godmother, AK, knew the father in childhood and became reacquainted with him as adults at church. AK grew up in the Shreveport/Bossier area, and her parents reside in Greenwood. Her husband, JK, serves in the United States Air Force. He was stationed at Barksdale Air Force Base until June 2016, when he was transferred to an Air Force base in Missouri.

However, the record reveals that the mother had already begun failing to take KC to medical appointments. The child was "no show" for a NICU follow-up on September 26, 2014, and two physical therapy appointments on November 4 and 11, 2014.

The father, who was born a conjoined twin, has several disabilities and medical issues. For much of the litigation, he was not working, and his sole financial support was a Supplemental Security Income ("SSI") check. He also received Section 8 housing assistance. He testified that he tried unsuccessfully to get a GED for more than two years. In early 2016, he began working out-of-state, painting for a contractor.

The father's mother also told the caseworker that the father was bipolar and that she did not know if he had been taking his medications. At the December 6, 2016 hearing, the father admitted being bipolar and taking daily medication for it. However, at the February 21, 2017 hearing, he denied being diagnosed as bipolar.
At various times during this litigation, the father has admitted taking medications for seizures, depression, anxiety, PTSD, and mood stabilization.

The court consolidated the new case involving KC with the original one on her and IP.

At the hearing, the mother put forth a friend, PR, as a possible foster parent, declaring that she had a "big problem" with the godparents. The trial judge stated: "If the department would look into [PR]. I'm not ordering a home study, I just want y'all to look further into that. If a home study is appropriate, take a look at that."

At the next hearing, the mother described IP as "devastated" and "crying uncontrollably" at the removal. She also said that the police "had to literally drag" IP and that KP was screaming as she was "ripped" from the mother's arms. However, the CASA volunteer, who was present for the incident, gave a vastly different description of the events. She testified that when she arrived, IP was with her mother, who was crying and picking up and hugging the girl. IP had to be "pulled off" the mother because the mother would not let go of her. According to the CASA volunteer, none of the children ever cried in her presence. After the CASA volunteer put the girls in the van to leave, IP told KP, "I told you ...we were getting taken."

At the conclusion of the hearing, the court ordered an interstate compact be done on the godparents for all three children, but stated that it was "inviting" the DCFS "to continue in the department's discretion a home study of [PR]'s home." The continued custody order for KP stated that "DCFS shall conduct a home study on [PR]."

Counsel for the three children, the State of Louisiana, and DCFS have all filed briefs in support of the judgment rendered in this case.

Interestingly, the record indicates that when IP first came into foster care in August 2013, she too was "developmentally delayed in her command of the English language" and behind on her pediatric appointments and immunizations.

Additionally, the father testified in 2014 that he had a seven-year-old daughter with another woman and that he was "court ordered not to come around" that child.

Among the excuses she gave for not taking her children to medical appointments were her Active Recovery class schedule; failure to receive calls from the doctor's office due to cellphone issues; and the alleged failure of the doctor's office to call or text and remind her. Yet she maintained she did not need constant "babysitting" to be able to care for her children. She also claimed that someone from Canterbury Square called and told her that her insurance no longer covered KC's appointments. However, she could not remember who the caller was, she had no supporting documentation, and she did not contact her insurance company for verification. The CASA volunteer contacted Canterbury Square and learned that there was insurance coverage and the office had tried unsuccessfully to reach the mother. In fact, KC's discharge summary stated: "Mother was contacted multiple times about missed appts. and did not return any calls or return to clinic." It also stated: "pt not returning to therapy or answering/returning any phone calls/letters."

According to the most recent CASA and DCFS reports, there have been some issues with the mother upsetting and confusing IP during these chats by telling the girl that she is "on vacation" with the godparents and that she is coming home to the mother. DCFS also reported disruptions of the video chats due to the mother's reluctance to provide the godparents with her schedule.

The mother has demonstrated a pattern of trying to remove from the children's lives people who offered them consistency and stability due to her perception that they were in opposition to her. In addition to the godparents, she also attempted to have the CASA volunteer replaced. The same, extremely dedicated CASA volunteer had been assigned to the children repeatedly since the two oldest girls first entered foster care in 2013. Throughout the turmoil of the past four years, she has remained a constant figure for the children, especially IP.