# STATE OF LOUISIANA

## COURT OF APPEAL

### FIRST CIRCUIT

### 2023 CJ 0174

### STATE OF LOUISIANA
### IN THE INTEREST OF M.N., M.N., AND Z.O.

*Judgment Rendered:* JUN 2 3 2023

\*\*\*\*\*\*\*\*

Appealed from the
City Court of East St. Tammany Parish
Juvenile Division, State of Louisiana
Case No. 21 JS 3028

The Honorable Bryan D. Haggerty, Judge Presiding

\*\*\*\*\*\*\*\*

| | |
|---|---|
| Annette Roach<br>CINC Appellate Project<br>Lake Charles, Louisiana | Counsel for Appellant<br>F.N., Mother |
| Sandra B. Terrell<br>Covington, Louisiana | Counsel for Appellee<br>State of Louisiana, Department of<br>Children and Family Services |
| Lanie Crawford<br>Child Advocacy Program<br>Mandeville, Louisiana | Counsel for<br>M.N., M.N., and Z.O., Children |

\*\*\*\*\*\*\*\*

BEFORE: WELCH, PENZATO, AND LANIER, JJ.

**LANIER, J.**

In this proceeding, the juvenile court awarded guardianship of two children to their foster parent. The children's mother appeals the ruling on the grounds that the juvenile court erred in finding that reunification was not a viable alternative, that reasonable efforts had not been made to assist her in reuniting with her children, and that the placement was not shown to be either in the children's best interests or the least restrictive disposition. For the following reasons, we affirm.

## FACTS

F.N. is the biological mother of Mr.N. (DOB 1/22/09), Mk.N. (DOB 7/22/15), and Z.O. (DOB 5/19/21). F.N.'s fiancé, D.O., is the biological father of Z.O.[1] R.V. is the biological father of Mr.N. and Mk.N. On July 13, 2021, the State of Louisiana, Department of Children and Family Services ("DCFS") received reports of alleged sexual abuse of Mk.N. by D.O., domestic violence in the home, and lack of adequate supervision.[2] The same day, DCFS worker Meghan McBride interviewed F.N. and D.O., who were both angry and denied any sexual abuse. F.N., however, admitted there had been domestic violence in the home. Ms. McBride observed F.N. to have two black eyes. F.N. stated that she and D.O. "got into it, but she deserved it." Ms. McBride requested that F.N. and D.O. to participate in a safety plan restricting D.O. from Mk.N. and requiring a safety monitor to report concerns regarding domestic violence.

During her visit, Ms. McBride also observed a handgun in Z.O.'s bassinet with the clip lying next to it, while Z.O. was sleeping alone on F.N. and D.O.'s bed in the same room. Ms. McBride contacted law enforcement, who then visited the home. Ms. McBride had to remove Z.O. from D.O.'s arms after he fell to the

---

[1] At the time of the December 13, 2022 hearing in this matter, F.N. and D.O. had another child between them.

[2] When Mk.N. was subsequently interviewed regarding the allegations, she made no disclosure of the reported sexual abuse.

ground while holding Z.O. and began punching the sofa. Mr.N. and Mk.N. both reported to Ms. McBride that they had witnessed physical altercations between their mother and D.O.

After a safety plan was executed, the case was assigned to another DCFS worker, Melanie Mann, who visited the home and reported that F.N. and D.O. were uncooperative. They refused to allow Ms. Mann to speak to the children, refused to sign any documents, stated they would not participate in the program or the investigation, and indicated they would appeal the case. F.N. then canceled an appointment with Ms. Mann. F.N. and D.O. did not attend the next appointment, after which it was discovered they had traveled to Florida with the children to look for housing. After Ms. Mann and other family members spoke to them, F.N. and D.O. returned to Louisiana with the children. On August 2, 2021, the juvenile court signed DCFS's instanter order placing the children into provisional state custody, and, following a hearing on August 3, 2021, the juvenile court signed a judgment continuing the children in the provisional custody of DCFS.

In September 2021, DCFS filed a child in need of care petition. The parents appeared at the subsequent answer hearing and entered denials. At an October 2021 hearing, the children were adjudicated children in need of care pursuant to stipulations without admissions by the parents.

On February 8, 2022, the parents appeared in court and testified at a case review hearing. D.O. stated that there had never been any domestic violence in the home. When asked about allegations that he had hit Mr.N. and F.N., D.O. denied every punching Mr.N. or hitting F.N. Similarly, F.N. testified that there was no domestic violence going on in the home and that she had never seen D.O. hit any of the children. Rather, she indicated that D.O. had stepped up to be a good father to her children. Moreover, F.N. denied being punched in the face by D.O. and

3

emphatically stated that she did not have two black eyes on the day DCFS initially came to the residence.

Charlotte Duncan, a DCFS caseworker, also testified at the hearing. Ms. Duncan indicated that DCFS had asked the parents to have an evaluation and follow the recommendations for domestic violence. At the time of the hearing, the parents had completed six of twenty-six domestic violence classes. Ms. Duncan further testified that the children had witnessed domestic violence in the home and were afraid. When asked what F.N. needed to do to complete her case plan, Ms. Duncan stated, among other things, that there needed to be some behavioral changes such as protective skills and putting the children's needs first. Ms. Duncan added that F.N. should complete the domestic violence classes, follow the rules, and prove to the children that there is no longer any domestic violence in the home.

The juvenile court also conducted a **Watermeier** examination of Mr.N. prior to the beginning of the hearing.[3] When asked how he felt about possibly being in the same home as D.O. again, Mr.N. stated that he did not "feel all right" about it and added that he did not want to get hit again by D.O. Mr.N. indicated that it was hard to forget being hit by D.O. in the past and that he remains fearful of being hit.

After hearing the evidence, the juvenile court found that although there had been some compliance by F.N. and D.O., they were "far from completing" the case plan. The juvenile court expressed great concern about the allegations of domestic violence in the home and ordered that both F.N. and D.O. complete their domestic violence classes. The juvenile court approved DCFS's case plan, which recommended reunification with a concurrent goal of adoption and placement in a

---

[3] See **Watermeier v. Watermeier**, 462 So.2d 1272 (La. App. 5 Cir.), writ denied, 464 So.2d 301 (La. 1985). A **Watermeier** hearing is a hearing in chambers, outside the presence of the parents, but in the presence of their attorneys, with a record of the hearing to be made by the court reporter, to inquire as to the competency of a child to testify as to custody. **In re D.C.M.**, 2013-0085 (La. App. 1 Cir. 6/11/13), 170 So.3d 165, 168 n.9, writ denied, 2013-1669 (La. 7/17/13), 118 So.3d 1102.

certified foster home, and ordered DCFS to coordinate family counseling with both the children's therapist and the parents' therapist. At a subsequent hearing on May 10, 2022, the juvenile court was updated on the parents' progress and was informed that the children's therapist did not recommend family therapy at that time. According to Ms. Duncan, who again testified regarding the case, neither Mr.N. nor Mk.N. expressed any interest in seeing D.O.

At a July 5, 2022 initial permanency hearing, DCFS foster care supervisor Shenicka Varnado advised the juvenile court that all of the children had been placed together in a certified foster home and were doing well. According to Ms. Varnado, Mr.N. and Mk.N. were in therapy, participating in summer activities, and enjoying visits with F.N. Further, F.N. and D.O. were visiting with Z.O. The matter was subsequently continued to August 2, 2022, for a full hearing.

Based on the transcript of the August 2, 2022 initial permanency hearing, it is unclear whether D.O. participated in family therapy before the hearing. There was a discussion at the hearing indicating that family therapy had taken place, but it appears the therapist stopped it at some point for issues relating to payment. The juvenile court ordered that custody of Z.O. would be returned to her parents, and custody of Mr.N. and Mk.N. would remain with the State.[4] The juvenile court granted a three-month AFSA ("Adoption and Safe Families Act") exception,[5] the basis for which was that the court had been advised by DCFS and the parents that family therapy would be necessary for the matter to proceed further. The juvenile court ordered that the therapist in this matter, Dale Haase at RKM Family, was to

---

[4] According to an October 2022 case report, Z.O. returned to the State's custody on September 1, 2022.

[5] The AFSA exception is a reference to the Adoption and Safe Families Act of 1997, pursuant to which states are mandated to establish "permanency plans" for children within the foster care system. The Act provides that such plans must demonstrate, *inter alia*, that the State make reasonable efforts to "preserve and reunify" the family. If such measures fail, the State is mandated to make reasonable efforts to place a child for adoption or with a legal guardian. **State in Interest of I.K.**, 2022-0927 (La. App. 1 Cir. 12/22/22), 358 So.3d 56, 60 n.2, writ denied, 2023-00089 (La. 3/7/23), 357 So.3d 349.

incorporate D.O. into family therapy and that the first meeting would take place within fifteen days of the hearing. A subsequent hearing was set for November 7, 2022, but the parties agreed to continue that hearing until December 13, 2022, to allow additional time to coordinate reunification therapy.

At the December 13, 2022 hearing, F.N. was present. R.V.'s presence was waived, as he was incarcerated, but he was represented by counsel at all times pertinent hereto. DCFS caseworker Heather Scallan and foster parent, M.O., both testified. Ms. Scallan indicated that when the case was "restaffed" prior to the December hearing, she had been advised to change the case plan recommendation to guardianship. After hearing testimony from Ms. Scallan and M.O., the juvenile court awarded guardianship of Mr.N. and Mk.N. to M.O. and ordered that F.N. be allowed a minimum of at least five hours per week of unsupervised visitation. The juvenile court further ordered that D.O. was to have no contact with the Mr.N. or Mk.N. F.N. was ordered to pay child support to M.O. in the amount of $100.00 per month to commence on April 1, 2023. Further, the juvenile court ordered that Mr.N. and Mk.N. "continue therapy until it is no longer therapeutically recommended." The juvenile court signed a judgment in accordance with its findings on December 21, 2022.

This appeal by F.N. followed. On appeal, F.N. argues that the juvenile court erred in finding that reunification was not a viable alternative in the case. F.N. further asserts that the juvenile court erroneously concluded that reasonable efforts had been made by DCFS to reunify the family. Finally, F.N. maintains that the juvenile court was manifestly erroneous in finding that guardianship was in the best interest of the children.

## LAW AND DISCUSSION

The purpose of guardianship is to provide a permanent placement for children when neither reunification with a parent nor adoption has been found to be

6

in their best interest; to encourage stability and permanence in the lives of children who have been adjudicated to be in need of care and have been removed from the custody of their parent; and to increase the opportunities for the prompt permanent placement of children, especially with relatives, without ongoing supervision by the department. La. Ch. Code art. 718(A). It is intended to ensure that the fundamental needs of children are met and the constitutional rights of all parties are recognized and enforced. La. Ch. Code art. 718(B).

The court must determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with certain priorities of placement, guardianship being below reunification and adoption. La. Ch. Code art. 702(C). In most permanent plan determinations, the court is required to determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health, welfare, and safety is the paramount concern in the court's determination of the permanent plan. La. Ch. Code art. 702(E). More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. **State in Interest of K.P.**, 51,853 (La. App. 2 Cir. 11/15/17), 246 So.3d 627, 634.

After a child has been adjudicated to be in need of care, the department may submit a case plan along with the case review report to the court and all counsel of record recommending guardianship. La. Ch. Code art. 720(A). According to La. Ch. Code art. 722(A), a mover for guardianship shall have the burden of proving all of the following by clear and convincing evidence:

(1) The child has been adjudicated to be in need of care.
(2) Adoption is not in the best interest of the child and the child cannot be safely reunified with the parent within a reasonable time.

7

(3) The child has resided for at least six months with the proposed guardian, unless the court waives the residence requirement for good cause.

(4) The proposed guardian is able to provide a stable and safe home for the child for the duration of minority.

In order for reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care. La. Ch. Code art. 702(C)(1); **State in Interest of K.P.**, 246 So.3d at 635. Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the State to remove the children from the parent's care and custody. **State in Interest of N.L.**, 54,429 (La. App. 2 Cir. 3/30/22), 335 So.3d 1018, 1023.

To reverse a juvenile court's permanency plan determination, an appellate court must find from the record that the juvenile court's finding is clearly wrong or manifestly erroneous. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. *Id.*

On appeal, F.N. argues that she demonstrated a willingness and ability to work her case plan and that only one obstacle remained. She asserts that while her "children's emotional well-being is a valid concern ... the decision that reunification was not a viable option was made too early with little to no effort made toward addressing the fears of the children or to assess whether there was a possibility of reunification at a later date." DCFS counters that F.N. showed no significant measurable progress as she failed to establish that she rectified the reasons upon which her children were removed from her custody, *i.e.*, the multiple instances of domestic violence that occurred between her and D.O. and were witnessed by the children.

8

Ms. Scallan testified at the December 13, 2022 permanency hearing that Mr.N. and Mk.N. were afraid of D.O. because of the physical abuse they endured while living with D.O. and F.N. and the domestic violence between their mother and D.O. Ms. Scallan indicated that the children had maintained from the beginning that they wanted contact with F.N. or would maybe even want to live with her. However, Ms. Scallan stated that the children do not feel safe around D.O. and that as long as F.N. is with D.O., Mr.N. and Mk.N. do not wish to be with her.

After considering the evidence before it, the juvenile court offered the following reasons for its judgment granting M.O. guardianship of the children:

> As to the domestic violence in this case by [D.O.], these children have been clear from the very beginning of this case. It was referenced earlier in a hearing in chambers with the young man. The young man was adamant about what occurred. He expressed fear of [D.O.] at that time. I did not meet separately with [Mk.N.], but it has been reported throughout the entirety of this case as to these children and the abuse that they have asserted occurred at the hands of [D.O.] and that has been consistent throughout. [F.N.], you have been present in the courtroom from the beginning of this case and you've heard that repeatedly in this case. The mother was aware of the children's fear of [D.O.]. The mother -- it's a very difficult position, but the mother had -- has made a choice and she's chosen [D.O.] over the children. I don't believe that I've heard testimony that -- but for the fact that [D.O.] resides in the home with you, that the children may have been, in fact, returned to you.
>
> The completion of a case plan of checking off boxes -- and I'm not suggesting that's all that has been done in this case. But satisfying the Court requirements in and of itself is not sufficient as I read -- as I advise every parent at every hearing. I've had to advise you, [F.N.], throughout this case. And, so, the paramount concerns are the children. As I stated moments ago, you made the choice, and your choice was to remain with [D.O.].
>
> Now, as to the reunification therapy. The Court has expressed its feelings as to the recommendation that was ordered by the Court. But the Court also takes -- is cognizant of the fact that [F.N.] has participated in therapy throughout this case. [D.O.] has participated in therapy; [Mr.N.] has participated in therapy; and [Mk.N.] has participated in therapy.
>
> Since the November 7th date, there have been two dates as I stated a moment ago, but I'll restate for the purpose of this hearing.

9

On November 10th and November 30th, in those two matters, the child, in particular, the most boisterous if you will, that has stated on the record was [Mr.N.] and his absolute fear of [D.O.] and does not want to participate. That was echoed as well from [Mk.N.]. She did not want to participate either, and did not want to be in the home with him. That was expressed by both children throughout this entire case.

. . . .

As to [F.N.'s] future plans with [D.O.] and the -- what has been clear to the Court is that, while it is an extremely difficult decision, [F.N.] has chosen to remain with [D.O.] and the children -- at the expense of two children not coming home. Now again, been through many, many cases of this sort, it is a horrible decision for a mother to make. But you've made your decision and your decision right now is that [D.O.] stays in the house. And now, of course, your whole family dynamic has changed with the two additional children. Nonetheless, the issue today is for [Mr.N.] and [Mk.N.].

. . . .

The burden in a guardianship recommendation is that of clear and convincing evidence. So, unlike our normal case, [F.N.], and your attorney has probably already shared this with you. The normal proceedings in these cases is a preponderance of the evidence. Clear and convincing evidence is a -- it's a higher burden.

One of the factors in this case, is that there are a few issues that I had changed and based on what I've been listening to in the testimony is not going to change, is that we have two children that have asserted that they've been abused by [D.O.]. That hasn't changed, it's not going to change. [D.O.] remains in the home. The children are not going to be forced to move into a home with an adult that they are fearful of and believe they had been abused by. There has been consistent testimony that these children love their mother. And, again, I've recognized now twice, it is an extremely difficult decision for moms to be in sometimes. But, your decision making could have been different quite a while back as opposed to where you are today.

The Court has considered very seriously a recommendation made in this matter in the closing arguments as to custody versus guardianship. The Court took quite a bit of time while I left the bench to weigh those, to see which would be in the best interests of the children. With all due respect to the mom, [D.O.], my obligation is to make sure that I keep the -- the children's interest paramount. That is the very -- that's the highest charge I have and when possible, we work to reunify.

The Court clearly sees that neither reunification nor adoption are appropriate in this case. The reunification -- the factor hasn't changed and that is the alleged abuser is in the home -- remains in the home and as I stated moments ago, there's been no indication he's

10

leaving the home. So, these children have to have a permanent placement.

. . . .

Since there was no testimony whatsoever as to the home environment changing and now taking note that you now have two young children and [D.O.] wanted a brand new child, just born recently. The Court is -- or based upon the facts -- finds that the -- the request for guardianship is appropriate in this case. And the Court is going to grant guardianship to [M.O.] in this matter. That is going to be subject to visitation with the mother.

Based on our thorough review of the record before us, we agree with the juvenile court that reasonable efforts were made to reunify F.N. with the children and that a permanent placement of guardianship with M.O. was in the children's best interest. Ms. Scallan's testimony affirmed that DCFS was still concerned about the children's safety and the fact that neither of them want to return to F.N.'s custody as long as D.O. is still in the home. As noted by the juvenile court, F.N. now has two children with D.O., and there is no evidence that their current home environment will change in the near future. We agree with the juvenile court that neither Mr.N. nor Mk.N. should be forced to move back into a home where they do not feel safe. In spite of the progress F.N. has made in the case plan confected for her by DCFS, F.N. continues to show that she is not willing to put her children's needs ahead of her own. Although F.N. has participated in therapy and has completed some domestic violence classes, it is clear from her actions that she still has more to do with regard to showing significant measurable progress and correcting the conditions that originally required the removal of Mr.N. and Mk.N. from her custody. Considering the children's health, welfare, and safety, we find no manifest error in the juvenile court's judgment, granting guardianship of Mr.N. and Mk.N. to M.O., subject to visitation with F.N.

## DECREE

For the above and foregoing reasons, we affirm the juvenile court's December 21, 2022 judgment placing Mr.N. and Mk.N. under the guardianship of M.O. All costs associated with this appeal are assessed against appellant, F.N.

**AFFIRMED.**