PITMAN, J.
The trial court adjudicated two children, C.F. and B.F., to be in need of care and, after a disposition hearing, placed them in the custody of their father, Jeremy F., and his wife, Leslie F. Jeremy's ex-wife, and mother of the children, Elizabeth Bryant, appealed the judgment of disposition. For the following reasons, we affirm the judgment of the trial court.
*1267 FACTS
On February 20, 2018, Pansey Rogers, an employee of the Department of Children and Family Services ("DCFS"), filed an affidavit in support of an instanter order concerning C.F. and B.F. The affidavit stated that as a result of Rogers's investigation into this case, she had gleaned the following facts:
On August 9, 2017, the DCFS received a report that two children, C.F., a deaf, 12-year-old male, who communicated through sign language only, and B.F., a 7-year-old female, were the victims of abuse by Bryant and her boyfriend, Randy Lemoine. The report stated that Bryant had been seen hitting C.F. across his face and that the children were verbally abused by both Bryant and Lemoine.
On August 14, 2017, Bryant and Lemoine were asked to submit to drug screening, and both objected. That same day, an anonymous source at the apartment complex where Bryant and the children resided told DCFS that approximately a week before, a man had B.F. standing in a corner and told her to "stand your MF ass in the corner or I will send your MF to Johnny Gray Jones."[1]
During the investigation that day, Rogers observed C.F. at his home. His right eye was black, but appeared to be healing. When C.F. was interviewed a few days later, he signed, through an interpreter, that his black eye was the result of his mother slapping him many times. He stated that she yells at him and often hits him. On that day, his left eye was black.
At B.F.'s interview by Rogers, she stated that when she got into trouble at home, she would be punished by having to sit on her bed and having the television withdrawn. She also stated that no one had hit C.F.
Both children were examined by a physician. At B.F.'s examination, she was asked to tell "good stuff" about her mother. She responded that her mother and Lemoine would "go outside and smoke," but could not recall anything else. Her maternal grandmother prompted her and said, "You went swimming," but B.F. stated that her mother was too tired. She reported that when she gets in trouble, her mother takes away her toys or she is spanked with a belt. B.F. has been diagnosed with ADHD and takes medication for that condition.
C.F.'s examination revealed that he is hearing impaired, has ADHD and needs dental care. He reported that his mother hits his face. Bryant informed the physician that the children were very rambunctious and overwhelming. The physician suggested that she try reinforcing sign language and get counseling.
On August 31, 2017, Bryant was drug screened through urine and hair samples by The Company Clinic of Louisiana ("CCLA"). The samples were sent to Quest Diagnostics Laboratory ("Quest Lab") in Kansas for testing. She tested positive for marijuana.
On September 21, 2017, Bryant was referred to DCFS's Family Services program to receive domestic violence and substance abuse assessments and random drug screens. Because C.F. wears a cochlear implant, Bryant was instructed to complete the procedures necessary for the implant to work, such as recharging the batteries. She informed DCFS that when C.F. was nine years old, she gave him the choice of whether to wear the device, and he chose not to wear it because he heard only loud screeching noises when he wore it. She stated that she offered him the choice because he always violently objected *1268 when she tried to make him wear it. She also admitted that she did not take him to the audiologist for years.
Although DCFS attempted to follow Bryant's case, she was uncooperative, would not complete her treatment plan, would not submit to the random drug testing and avoided the agency. DCFS assigned Beverly Hamilton to Bryant's case.
In February 2018, DCFS received a second report concerning Bryant and C.F., which alleged that Bryant was taking C.F.'s ADHD medicine. Rogers interviewed C.F. at school, and C.F. signed that he was supposed to take two pills in the morning, but that he was only getting one, and that his mother would take the other. Also, he was still not wearing his cochlear device and had not worn it all year.
DCFS interviewed B.F. who told investigators that Bryant's new boyfriend, Joshua James, would spank her behind and would drag her to her room by her arm and squeeze it very tightly even though she tried to tell him she was sorry for whatever she had done.
School attendance by both children was a concern. On February 5, 2018, C.F. had 11 unexcused absences and had been tardy 8 times. B.F. had 15 unexcused absences and had been tardy 8 times.
A family services plan was implemented. On February 8, 2018, Bryant was drug screened by CCLA, and the samples were sent to Quest Lab. Her urine results were positive for amphetamines, methamphetamines and marijuana. The hair follicle report was positive for methamphetamines and marijuana.
Because James had moved into the home, he was also drug screened by CCLA, and the samples were sent to Quest Lab. He tested positive for amphetamines, methamphetamines and marijuana.
On February 13, 2018, Rogers and Hamilton went to Bryant's home, but no one answered their knock on the door. They heard children in the back yard and found C.F. and B.F. alone there. B.F. said her mother was inside, but asleep. The worker asked her to go in the house and wake up her mother. When Bryant appeared on the back porch, she appeared to be high, but she claimed she was sick and might have the flu. Hamilton asked to count the children's medication and found that B.F.'s Adderall was six pills short. Bryant claimed she had given C.F. two of B.F.'s pills because she had lost his bottle of pills.
On February 16, 2018, B.F. was also drug tested at CCLA, and the samples were sent to Quest Lab. Her urine test was positive for amphetamine and her hair sample was positive for methamphetamine.
An instanter order was requested; and, on February 16, 2018, a verbal instanter order was issued, placing the children in the temporary custody of DCFS. At the continued custody hearing on February 22, 2018, the hearing officer made recommendations that there were reasonable grounds to believe that both children were in need of care, and the children were placed in the custody of DCFS. The recommendations were not appealed; and, on March 12, 2018, a petition was filed by the state alleging the children should be declared in need of care.
An adjudication hearing was held on June 27, 2018. The state introduced three exhibits, S-1 through S-3, which were the results of the February 2018 drug tests on Bryant, James and B.F. The front page of each exhibit certified the documents as health care provider records under La. R.S. 13:3715. Kimberly Morscher, vice president, clinical director and custodian of records for CCLA, testified that the urine and hair samples were all taken at CCLA and processed by Quest Lab. She stated *1269 that CCLA is a medical facility operating in the State of Louisiana which provides occupational medicine, including drug screenings, fitness tests, physicals, blood draws, vaccinations and hearing tests. She also testified that CCLA performs tests for DCFS, including drug screening services and physicals for adults and children. She stated that CCLA draws the sample to send to the lab, in this case, Quest Lab, which performs the tests and posts the results on its website. An authorized representative of CCLA retrieves those results. She is the person who collected the test results of Bryant, James and B.F., after which she compiled these results into the medical record for those three individuals. She stated that the records are printed from the Quest Lab website and are then scanned into CCLA's electronic medical record, which is HIPPA compliant. The files were admitted into evidence as Exhibits S-1 through S-3.
Bryant's attorney objected and questioned Morscher concerning the certification of the documents under La. R.S. 13:3715, which the attorney claimed applied only to state-operated health care facilities. The state's attorney interjected that she was certifying the records as a health care provider, not as a state-run health care facility. She stated that they would fall under La. R.S. 13:3714, which concerns charts of records or hospitals, other health care providers, admissibility of certified attested copies and BAC scientific analysis reports. She pointed out that the document may say "715," but that the witness was present in court offering live testimony regarding the certification. She insisted that there was a difference between introducing the records as certified records and actually providing live testimony to the fact. She claimed that the indication on the front page was simply a typo and that it should be "3714."
The trial court told Bryant's attorney that it noted the objection, but admitted Exhibits S-1 though S-3 "over your strong objections both as to foundation, opinion, and hearsay." The state moved to withdraw any of Bryant's drug tests related to samples taken after February 22, 2018. The motion was granted. Bryant's attorney also objected to the lack of the right of confrontation as a separate objection from the hearsay objection.
Rogers testified regarding Bryant's drug tests, C.F.'s hearing impairment and cochlear implant, the condition of the children when she went to the school to interview them, and about the men who had lived in Bryant's home during the span of the investigation by DCFS. She stated that Bryant was unable to explain why B.F.'s drug screen returned a positive result for methamphetamine. She testified that on the day she went to Bryant's house and found the children in the back yard wearing their school uniforms, she asked Bryant why they were not at school, and Bryant told her she had a flat tire on her vehicle. She confirmed that Bryant did have a flat tire that day. She also testified that it was that same day that she and Hamilton checked C.F.'s ADHD medication and found that the entire prescription was missing. The children were then adjudicated to be in need of care.
A permanent disposition hearing was held on July 16, 2018. At the hearing, Jeremy F. testified that the children were placed with him the day after they were removed from Bryant's home. He stated that it took two to three weeks before Bryant gave him the necessary part of the cochlear implant for C.F. to be able to hear. He learned that C.F. had not been to the audiologist in four years and took the child to the doctor, who adjusted the cochlear implant until C.F. could hear words and not screeching noises. He stated he *1270 took C.F. to the audiologist several more times for the device to be "tweaked," and it was so successful that C.F. was able to hear words and no longer had to read lips. He testified that C.F. wears his cochlear device from the time he gets up until he goes to bed, at which time it must be recharged.
The trial court placed the children in the joint custody of their father and stepmother. Bryant was given visitation at the discretion of Jeremy and Leslie F. as to the amount of time she would be allowed to visit and whether the visitation would be supervised or unsupervised. It further encouraged Jeremy and Leslie F. to allow liberal visitation with Bryant's parents. DCFS's custody and supervision were vacated.
Bryant has appealed the judgment of disposition and has challenged the admission of Exhibits S-1 through S-3 on the basis of hearsay and the constitutional right to due process.
DISCUSSION
Bryant argues that the standard of review in a juvenile court's permanent placement determination is governed by the manifest error standard, but when critical findings are not supported by competent evidence, the appellate court has a duty to reconsider the actual evidence and to render an appropriate judgment after conducting a de novo review.
Bryant claims that the sole basis for removal of the children was her alleged drug use and that of her boyfriend at the time, James, and the alleged drug exposure of B.F. She argues that there were no admissions by the parties and the only evidence presented was that of drug test results contained in Exhibits S-1 through S-3. She also argues that there were numerous allegations that the children were otherwise abused or neglected, as found in the affidavit in support of the instanter order and the state's petition, but the evidence at the evidentiary hearing did not support those allegations. Morscher, from CCLA, who testified with respect to the certification and drug tests results, and Rogers, a DCFS investigator, were the only witnesses at that hearing.
In regard to the admission of Exhibits S-1 though S-3, Bryant argues that it was error for the trial court to allow the documents into evidence because the front page said they were certified as records under La. R.S. 13:3715, but the trial court allowed them admitted under La. R.S. 13:3714. She contends that this was error since CCLA could not certify the business records of another business entity over which they had no knowledge or control, i.e. , Quest Lab, and that this introduction skewed the evidence and prejudiced the case against her.
Bryant argues that the admission of the exhibits violates the rule against hearsay and that none of the exceptions in the Code of Evidence apply in this case. She states that the exhibits are signed by Morscher as the vice president and clinical director of CCLA; but, since CCLA is not a "state operated health care facility" under La. R.S. 13:3715, no further inquiry need be made.
Bryant also argues that the trial court erred in allowing the rehabilitation of the certification when it allowed the assistant district attorney to claim typographical error and that the certificates should have read La. R.S. 13:3714 instead of La. R.S. 13:3715. She also argues that it erred by allowing the exhibits to be introduced as the records of "any other health care provider."
Bryant further argues that La. R.S. 13:3714 specifically allows the party against whom the bills, medical narrative, chart or record is sought to be used to "summon and examine" those making the *1271 original of the bills, medical narrative, chart or record, as witnesses under cross-examination. Bryant claims the person making the report was the certifying scientist employed by Quest Lab, but that person on the Quest Lab form is identified only by a code. She claims that the summoning of an out-of-state witness to compel his or her appearance would be problematic and a subpoena of that person would be problematic.
She further argues that the trial court's admission of the Quest Lab and CCLA records was the only reason the children were deemed in need of care. She claims the balance of the testimony provided by the state through Rogers was clearly insufficient to independently support the need-of-care ruling.
The state argues that although La. R.S. 13:3714 gave Bryant the right to summon and cross-examine the original makers of the record reports from Quest Lab, she refused to take any action to procure the maker's presence because she did not believe a subpoena would have been successful. That is the reason why Bryant did not even attempt to secure the witness for cross-examination. For these reasons, it claims that argument relating to her due process right of confrontation is without merit.
As to the argument that CCLA could not certify a business record from another company over which it exercises no control by incorporating the record into its own health care provider records, the state points out that hospital records are deemed to be inherently reliable; thus, no foundation, beyond certification, is required for the admission of certified hospital records. It claims that the Quest Lab records were already properly certified at the time they were admitted into evidence through Morscher's testimony and needed no further foundation to be laid to be admitted into evidence.
Bryant attempted to argue that Quest Lab was not a hospital or health care provider in conformity with the statute and, thus, would have to certify its own records. However, the state responded that Bryant never raised this argument at the trial court and it cannot now be objected to at the appellate level. It contends that the argument should be deemed waived and precluded from appellate review.
The state also argues that the trial court did not err in finding that the children were in need of care and that Rogers's testimony was sufficient to independently support the trial court's finding. It reiterates the facts of the case, including that almost everyone in the household tested positive for drugs, that the children did not attend school regularly, that the children's medicine count was askew, that Bryant claimed she had lost a prescription and that C.F. did not wear the portion of the cochlear device that allowed him to hear at school. For these reasons, it claims there was sufficient evidence for the trial court's ruling adjudicating the children in need of care and placing them with Jeremy and Leslie F.
An appellate court's review of a juvenile court's permanent placement determination is governed by the manifest error standard. State in Interest of N.C. , 50,446 (La. App. 2 Cir. 11/18/15), 184 So. 3d 760, citing State ex rel. C.M. v. Willis , 41,908 (La. App. 2 Cir. 12/27/06), 946 So. 2d 316, writ denied , 07-0190 (La. 2/16/07), 949 So. 2d 413. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. State ex rel. L.M. , 46,078 (La. App. 2 Cir. 1/26/11), 57 So. 3d 518.
In *1272 State ex rel. W.H.V. v. J.A.V. , 35,887 (La. App. 2 Cir. 2/27/02), 811 So. 2d 189, the court stated that under the manifest error standard of review, in reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Citing Hill v. Morehouse Par. Police Jury , 95-1100 (La. 1/16/96), 666 So. 2d 612. Before a fact finder's verdict can be reversed, the court must find from the record that a reasonable factual basis does not exist for the verdict and that the record establishes that the verdict is manifestly wrong. It is the appellate court's constitutional duty to review facts to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence or clearly without evidentiary support. State ex rel. W.H.V. v. J.A.V., supra . The reviewing court must consider whether the trial court's findings are reasonable in light of the record taken as a whole. Id.
Admission of Evidence as Certified Records
La. R.S. 13:3715 concerns the admission of charts and records by state-operated health care facilities. La. R.S. 13:3714 concerns admissibility of certified or attested copies of other health care providers and states in pertinent part as follows:
A. Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, or a copy of a bill for services rendered, medical narrative, chart, or record of any other state health care provider, as defined by R.S. 40:1299.39(A)(1) and any other health care provider as defined in R.S. 40:1299.41(A), certified or attested to by the state health care provider or the private health care provider, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the bills, medical narrative, chart, or record is sought to be used may summon and examine those making the original of the bills, medical narrative, chart, or record as witnesses under cross-examination.
La. R.S. 40:1231.1(A)(10)[2] states in pertinent part as follows:
(10) "Health care provider" means a person, partnership, limited liability partnership, limited liability company, corporation, facility, or institution licensed or certified by this state to provide health care or professional services as a physician, hospital, nursing home, community blood center, tissue bank, dentist, a licensed dietician or licensed nutritionist employed by, referred by, or performing work under contract for, a health care provider or other person already covered by this Part, ... or any partnership, limited liability partnership, limited liability company, management company, or corporation whose business is conducted principally by health care providers, or an officer, employee, partner, member, shareholder, or agent thereof acting in the course and scope of his employment.
In Judd v. State, Dep't of Transp. & Dev. , 95-1052 (La. 11/27/95), 663 So. 2d 690, the court stated that the purpose of La. R.S. 13:3714 is to save a litigant the difficulty and expense of producing as a witness each person who assisted in the treatment of the patient. It also provides an exception to the hearsay rule with respect to those who made the medical record. The court stated that once La. R.S. 13:3714 is complied with, the records are admissible. Id.
*1273 The medical records presented in Exhibits S-1 though S-3 were certified in court by Morscher, the vice president and clinical director of CCLA. She testified that CCLA is a medical facility operating in the State of Louisiana and providing a variety of medical tests, including drug screenings, blood draws, hearing exams and vaccinations. She testified that CCLA performed the drug screenings on the litigants and children in the matter at bar and sent the tests to Quest Lab to be processed, which results she then recovered from the Quest Lab website and integrated into CCLA's file. Therefore, Morscher certified the tests and results from Quest Lab and the medical records that were produced by CCLA, and the certification complied with the requirements of La. R.S. 13:3714. We find that Bryant was not prejudiced by the notation on the front of the exhibits which stated they were created pursuant to La. R.S. 13:3715, instead of La. R.S. 13:3714.
Accordingly, this assignment of error is without merit.
Due Process Argument
Bryant complained that the trial court erred in admitting the exhibits into evidence because she was not allowed to test the reliability of the underlying test report from Quest Lab, and because CCLA cannot vouch for the reliability of the results which were generated from another company over which CCLA exercised no control.
La. R.S. 13:3714(A) specifically states that certified medical records shall be received in evidence by such court as prima facie proof of their contents, if the party against whom the medical narrative, chart, or record is sought to be used is given the right to summon and examine those making the original of the bills, medical narrative, chart, or record as witnesses under cross-examination. As stated in Judd , supra , the purpose of the statute is to save a litigant the difficulty and expense of producing as a witness each person who assisted in the treatment of the patient.
In the case at bar, Bryant had the option to subpoena Quest Lab so that the person who performed the tests on the samples provided by CCLA and produced the results of the tests could testify and certify the record, but Bryant chose not to do so. For that reason, the certification of the tests and the results by CCLA was sufficient to validate them. The requirements of La. R.S. 13:3714 were met.
Therefore, this assignment of error is without merit.
The Disposition of the Children
Our review of the record shows no manifest error on the part of the trial court in the adjudication and disposition of the children. A reasonable factual basis exists for the finding that the children are in need of care and that placement with Jeremy and Leslie F. is warranted. The evidence presented indicated that both B.F. and C.F. were subjected to verbal abuse and neglect while living in the home of their mother, who tested positive for drugs and even managed to expose her daughter to methamphetamine. Her deaf son was allowed to forgo the use of his cochlear implant, had black eyes, which he said were attributable to his mother, and missed his medication as a result of his mother's abusing it instead of giving it to him. We consider the trial court's findings reasonable in light of the record taken as a whole.
Therefore, this assignment of error is without merit.
CONCLUSION
For the foregoing reasons, the judgment of the trial court permanently placing the children, C.F. and B.F., in the care of their father and stepmother, Jeremy and Leslie *1274 F., with visitation to be allowed with their mother, Elizabeth Bryant, at the discretion of Jeremy and Leslie F., is affirmed. Costs of the appeal are assessed to Elizabeth Bryant.
AFFIRMED .

Johnny Gray Jones is a youth shelter in Bossier City, Louisiana.

Sections 1299.41 to 1299.49 were redesignated as R.S. 40:1231.1 to 40:1231.10 by H.C.R. No. 84 of the 2015 Regular Session.