NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-408

STATE IN THE INTEREST OF

J.G., B.T., AND B.T.

**********

APPEAL FROM THE
OPELOUSAS CITY COURT
PARISH OF ST. LANDRY, NO. JV-11092
HONORABLE SHAUNN CAILLIER HARDEN, JUDGE

**********

**D. KENT SAVOIE**
**JUDGE**

**********

Court composed of D. Kent Savoie, Van H. Kyzar, and Sharon Darville Wilson, Judges.

**AFFIRMED.**

**Jane Hogan**
**CINC Appellate Project**
**310 North Cherry Street**
**Hammond, Louisiana 70401**
**(985) 542-7730**
**COUNSEL FOR APPELLANT:**
 **T.G. (Mother)**

**Lauren Mouret**
**Office of the Public Defender**
**115 North Court Street**
**Opelousas, Louisiana 70570-5253**
**(318) 948-8276**
**COUNSEL FOR APPELLANT:**
 **T.G. (Mother)**

**Chad Pitre**
**District Attorney**
**Kathleen E. Ryan**
**H. Glenn Marcantel, Jr.**
**Assistant District Attorneys**
**Twenty-Seventh Judicial District**
**Post Office Box 1968**
**Opelousas, Louisiana 70571**
**(337) 948-0551**
**COUNSEL FOR APPELLEE:**
 **State of Louisiana**

**Kimberly Morrow**
**Attorney at Law**
**111 North Court Street**
**Opelousas, Louisiana 70570**
**(337) 580-1231**
**COUNSEL FOR OTHER APPELLEE:**
 **B.T. (Father of B.T. & Br.T.)**

**Abbey L. Williams**
**Attorney at Law**
**111 North Court Street**
**Opelousas, Louisiana 70570-5253**
**(337) 942-7193**
**COUNSEL FOR OTHER APPELLEE:**
 **J.S. (Father of J.G.)**

**Avery Guidry**
**Acadiana Legal Services Corporation**
**1020 Surrey Street**
**Lafayette, Louisiana 70501**
**(337) 237-4320**
**COUNSEL FOR OTHER APPELLEE:**
     **J.G. (minor child)**
     **Br.T. (male minor)**
     **B.T. (female minor)**

**SAVOIE, Judge.**

T.G., the mother of the minor children J.G. (female born 6/17/20), B.T. (female born 1/16/14), and Br.T. (male born 2/27/16), appeals the judgment of the Opelousas City Court, granting guardianship of the minor children to their maternal grandmother, K.J.[1]  For the following reasons, we affirm.

## FACTS

On November 3, 2021, an Instanter Order for Removal and Provisional Custody to the Department of Children and Family Services (DCFS) was filed to remove J.G., B.T. and Br.T. from the care of their mother T.G. and her boyfriend M.G.  After a hearing on November 4, 2021, the trial court signed a Continued Custody Order, placing the children in the provisional custody of K.J., the children's maternal grandmother.  A Petition for Custodial Child in Need of Care was filed November 22, 2021.  T.G., Bry.T. (father of B.T. and Br.T.), and J.S. (father of J.G.) were served with the petition.

The Petition for Custodial Child in Need of Care (underlining deleted throughout) states:

> On October 30, 2021[,] [T.G.,] the mother of [J.G.,] brought her daughter to Opelousas General Hospital with concerns because her arm was swollen.  Upon the examination by medical professional[s,] it was determined that the (1 [year]) old sustained a humeral fracture of the right extremity after it was reported she had fallen down from a standing position.  During the investigation there were some inconsistent stories.  [T.G.] the mother reported she was at work while her boyfriend assists her by watching her children while she is at work.  According to [T.G.,] she called to check on her children and that's when her boyfriend [M.G.] informed her the [J.G.] was hitting her head on the door and she fell.  When she returned home from work [J.G.] was on the sofa and that's when she notice[d] her arm was swollen.  At the time [T.G.] stated she called [M.G.] and told him she was going to take [J.G.] to the hospital to get checked out.

---

[1] Per Uniform Rules—Courts of Appeal, Rules 5–1(A)(1), 5–2, "[t]o ensure the confidentiality of a minor who is a party to or whose interests are the subject matter in [Child in Need of Care proceedings], initials shall be used in all filings and in opinions rendered by the Court of Appeal."

When speaking with [M.G.] in regard to what occurred in the home he reports that he was in the back room cleaning while the children were in the front living area. At the time he heard crying he then went to the front to see what was occurring, that when [B.T.] told him her sister [J.G.] was hitting her head on the front door and fell. [M.G.] reports [J.G.] stopped crying once he got to the front [] of the apartment and began to play again.

When speaking with the children [B.T.] and [Br.T.] they both reported that their sister [J.G.] was hitting her head on the door and fell, but when she went to sleep on the sofa she must have slept on her arm. As the investigation continued upon the initial contact[, Br.T.] was asked who was home at the time of his sister's incident he reported himself, [J.G.,] and [B.T.] were home. [Br.T.] indicated that [M.G.] was not home with them [because] he had left them alone to go cut grass. When the agency worker then question[ed] [B.T.] to see if [M.G.] was home[, B.T.] [] indicated that [] [M.G.] was not home [because] he had left to go cut grass.

Agency worker requested Officer Yolanda Lewis (Opelousas City Police) take the mother [T.G.] outside and let her know how server [sic] this was because of her child's injury and [] being told that no was home supervising these under age children who are age[s] 7, 5, 1 years old. Officer Lewis spoke with [T.G.] outside and her story changed from the original reports. [T.G.] then reports to Officer Lewis that she did that [to] her daughter she feels because prior that morning she was playing with [J.G.] and she took her swinging her around by the arm.

Additional information that was received as the investigation continues agency worker was able to speak with the doctor who was on [J.G.'s] case when she was observed and treated at the Opelousas General Medical Center which was Dr. Kevin Karam. Dr. Karam reports he called in the report to the agency because he has some serious concerns of the nature of the fracture. According to Dr. Karam, the mother reported to him that the child was in the room alone with her older sibling where she fell then hit her head. Based on Dr. Karam['s] practice [] the child's injury was not a typical injury from a fall. Dr. Karam expressed that it was suspicious and concerning to him because the typical injury the child sustain[ed] could have been an elbow injury, but not a Humerus Shaft Fracture in which the child sustained.

Medical Record[s] when [J.G.] was transferred to Our Lady of Lourdes Women and Children indicate her diagnos[is] as a closed fracture of shaft of right humerus, unspecified fracture morphology, initial encounter, closed fracture of right forearm, initial encounter.

As the above information has no consistency, the reported information drew a red flag of concern for the children['s] safety being that there are also alleged concern[s] of domestic violence

2

issues between the mother and [M.G.] while in the presence of the children in the home, in which [T.G.] and [M.G.] both deny. Therefore, the child was placed in the custody of the state of Louisiana, Department of Children & Family Services[.]

In the Affidavit attached to the Instanter Order, DCFS employee Crystal Ledet explained:

The agency felt it was in the interest of the [children] to be placed in the custody of The Department of Children and Family Services, due to Physical Abuse/Bone Fracture. [T.G.'s] and [M.G.'s] stories were inconsistent during the investigation where the children were apparently left home alone to care for themselves, which may have led to the 1-year-old['s] bone fracture and there were also concerns of domestic violence in the home while in the presence of the minor children. [T.G] disclosed that she does not trust her family, they [are] no good and messy which the agency was not able to implement[] a safety plan[.]

The DCFS Case Plan gives reasons that the children were placed in foster care, explaining:

The agency received a report on 10/30/2021 of Physical Abuse/Bone Fracture. [J.G.] (1 year old) sustained a humeral fracture of the right extremity after a reported fall from a standing position. The medical staff had concerns [about] the injury because it's a hard bone to break which usually doesn't occur from a standing position in children. The mother was not present when the injury occurred, an aunt or another family member were [sic] reportedly supervising the children during the time of the incident. It was reported that [J.G.] was playing with other children at the time she fell on the floor. The injury is reported sustained typically when force is applied. It was reported that the mother (T.G.) appeared to be aggravated with medical staff. It was reported that the mother stated she did not want [J.G.] to receive IV or have X-rays completed. Reportedly the mother appeared to be agitated with medical staff the entire time. It was reported the mother held the child the entire time during the hospital visit. The child didn't appear afraid of the mother. The child appeared well cared for in terms of hygiene, no other injuries were observed. The child was transferred to a facility that has orthopedics for pediatrics, Women's and Children's Hospital in Lafayette.

The agency received additional information on October 30, 2021[,] stating that 1-year-old [J.G.'s] arm was broken in two places. The mother's boyfriend [M.G.] was allegedly babysitting the children at the time. It was reported that [M.G.] stated he had left the home 20 minutes prior to the mother, [T.G.'s] return from work, leaving the children alone. It was reported that [T.G.] stated [J.G.] was crying and would not stop. She then took the baby to the Opelousas General Hospital the same night where she reportedly stated to medical

3

personnel the child had fallen out of the bed. It was reported that Law Enforcement became involved. It was reported that the mother never leaves her children alone, while she is working, her boyfriend [M.G.] agrees to watch them but on occasion leave them unattended and alone in the home. It's been reported that the amount of time the children are left alone is uncertain. It's been reported that [T.G.] has been advised not to leave the children alone at all because of their ages. It was reported that the mother [T.G.] stated she was swinging the child around and is certain the injury occurred from that. It was reported the mother brought the baby to the hospital because she would not stop crying and stated to the medical personnel the baby fell out of the bed. It was reported there is domestic violence in the house with [M.G.] being the aggressor and has never been reported to LE. It is reported that [M.G.] is a convicted felon and has charges at this time.

The agency worker arrived to the hospital and reported[ly] received 3 different stories on how the injuries occurred. The verbal children; 5-year-old [Br.T.] and 7-year-old [B.T.] both stated that [they] were left alone by the mother's boyfriend. The boyfriend gave a different story. The mother was interviewed and gave a different story as well. It is believed that the mother is protecting the boyfriend instead of her minor children, which shows diminished caretaker protective capacities. She may possibly be scared of the boyfriend. The mother is also pregnant, approximately 5 months pregnant. The one-year-old has a sling on the right arm.

Due to the fact that the worker received 3 different stories, the verbal children confirmed being left alone, and the mother's story being inconsistent and stating it was her fault, makes the children vulnerable and unable to protect themselves.

Because of these circumstances, the children were placed with their maternal grandmother K.J., which was determined to be "the least restrictive and family like setting[.]" The school-aged children were able to remain at the same school.

In the court reports prepared by DCFS in anticipation of the regular review hearings in this case, it explained what T.G. would need to do in order to be compliant with her case plan. Specifically, it stated:

[T.G.] will [need to] demonstrate a healthy and domestic free lifestyle. [T.G.] will need to ensure that she completes all of her domestic abuse classes. [T.G.] will need to file a protective order against [M.G.] towards the minor children. She will need to maintain [] safe and stable housing free of danger for the minor children. She will need to follow all recommendation[s] of the agency and any participating health care providers.

4

The reports described the conditions for closure of the case, stating: "[T.G.] will need to complete her domestic violence courses. [T.G.] will need to be able to demonstrate protective parental skills for her minor children from the alleged perpetrator. She will need to continue to maintain safe and stable housing." A later report added, "[T.G.] will need to ensure that [M.G.] completes all his required aspects of case plan or remove [M.G.] from the home."

When explaining her status with M.G., one report stated, "[T.G.] is in a relationship with [M.G.] who has not yet completed his domestic violence course requirement[s] as he resides in the home with her." When discussing T.G.'s progress, the report states, "[T.G.] has failed to demonstrate proper protective parental skills by maintaining contact with the alleged perpetrator [M.G.]"

The original case plan goal was reunification. However, by the time the permanency hearing was held on March 15, 2023, DCFS's recommendation had changed to guardianship with subsidy.

At the permanency hearing, Toddra Cole, the Foster Care Worker with DCFS, testified. While she admitted T.G. had complied with her case plan, she stated that the agency is concerned that T.G. is still in a relationship with M.G., the person that initiated the abuse of her daughter. She further testified that the children are scared of M.G. When Ms. Cole conducted a pop-up visit at T.G.'s residence in February, M.G. answered the door. T.G. and M.G. have had a child together since this case began. Ms. Cole explained that it is the children's wish to live with their grandmother.

There was also testimony that T.G. treats her children differently. She blames B.T. for the children being placed in foster care. Ms. Cole testified that T.G. attempts to bribe Br.T., and T.G. treats Br.T. better than B.T.

K.J. testified that T.G. told B.T. after the last court hearing that it was her fault that the children were in foster care. T.G. told Br.T. that it was his sister's fault that they could not go home with T.G. K.J. testified that this upsets B.T. greatly, and K.J. had to console B.T. at night on several occasions because of it. B.T. also told K.J. that her mother will not let her be in any pictures with the family. K.J. testified that B.T. told her that she believes her mother lied to them and that she is still with M.G. K.J. further testified that she drove by T.G.'s house at 6:00 a.m. one day the previous week, and M.G.'s car was in the driveway. K.J. stated that, based on what the children and neighbors have told her, she believes M.G. is still living with T.G. She also testified that she does not deny access to the children to any of the parents. The children have been placed with K.J. throughout the duration of this case.

T.G. testified that there always has to be someone at her house because the area she lives in is an area known for drugs. She denied that she is in a romantic relationship with M.G. and claims that M.G. lives with his mother. On rebuttal, T.G. admitted that she is harder on B.T. than Br.T. She also admitted that she told B.T. that it was her fault her kids were taken away from her. She claims she apologized. She further admitted that M.G. does spend the night at times, but she states that it is because he comes over to help with their daughter when T.G. is doing schoolwork.

At the end of the hearing, the trial court found that the most appropriate permanent plan for the best interest of the children is guardianship with subsidy. The trial court found that DCFS made reasonable efforts to reunify the children and parents. The trial court approved the case plan submitted by DCFS dated October 4, 2022, finding that it is consistent with the health and safety of the children and in the best interest of the children. The trial court found that T.G.

worked her case plan, but it found there was an issue with M.G., as he is not out of the picture. The trial court found that T.G has consistent contact with M.G. The trial court further found that the main aspect of the case plan is to protect the children from M.G., and he is not out of the residence. For these reasons, the trial court granted guardianship with subsidy to K.J.

T.G. now appeals.

## LAW AND DISCUSSION

Louisiana Children's Code Article 718 states the purpose of guardianship:

> A. The purpose of guardianship is to provide a permanent placement for children when neither reunification with a parent nor adoption has been found to be in their best interest; to encourage stability and permanence in the lives of children who have been adjudicated to be in need of care and have been removed from the custody of their parent; and to increase the opportunities for the prompt permanent placement of children, especially with relatives, without ongoing supervision by the department.

> B. This Chapter is intended to ensure that the fundamental needs of children are met and the constitutional rights of all parties are recognized and enforced.

T.G. argues that the trial court erred in granting guardianship with subsidy to K.J. because she complied with her case plan, and the original goal was reunification. "In order for reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care." *State in the Interest of M.N.*, 23-174, p. 8 (La.App. 1 Cir. 6/23/23), 370 So.3d 744, 749, *writ denied*, 23-947 (La. 9/6/23), 369 So.3d 1269; La.Ch.Code art. 702(C)(1).

> In most permanent plan determinations, the court is required to determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health, welfare, and safety is the paramount concern in the court's determination of the permanent

7

plan. La. Ch. Code art. 702(E). More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. **State in the interest of K.P.**, 51,853 (La. App. 2 Cir. 11/15/17), 246 So.3d 627, 634.

*Id.* at 749.

Under La.Ch.Code art. 722(A), the party applying for guardianship must prove, by clear and convincing evidence, that:

(1)     The child has been adjudicated to be in need of care.

(2)     Adoption is not in the best interest of the child and the child cannot be safely reunified with the parent within a reasonable time.

(3)     The child has resided for at least six months with the proposed guardian, unless the court waives the residence requirement for good cause.

(4)     The proposed guardian is able to provide a stable and safe home for the child for the duration of minority.

"Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the State to remove the children from the parent's care and custody." *State in the Interest of M.N.*, 370 So.3d at 749. In order to reverse the trial court's determination, "an appellate court must find from the record that the juvenile court's finding is clearly wrong or manifestly erroneous." *Id.*

In *State in the Interest of M.N.*, 370 So.3d 744, the juvenile court ordered guardianship of the children rather than reunification. The mother appealed, arguing that she demonstrated a willingness and ability to comply with her case plan. DCFS asserted that she refused to rectify the reasons her children were removed from her custody, which was the domestic violence issues between her and her fiancé. These issues were witnessed by her children. The DCFS case worker testified that the children did not feel safe around their mother's fiancé, and

8

as long as she was with him, they did not want to live with her. The appellate court determined:

> Based on our thorough review of the record before us, we agree with the juvenile court that reasonable efforts were made to reunify F.N. with the children and that a permanent placement of guardianship with M.O. was in the children's best interest. [DCFS case worker's] testimony affirmed that DCFS was still concerned about the children's safety and the fact that neither of them want to return to F.N.'s custody as long as D.O. is still in the home. As noted by the juvenile court, F.N. now has two children with D.O., and there is no evidence that their current home environment will change in the near future. We agree with the juvenile court that neither Mr.N. nor Mk.N. should be forced to move back into a home where they do not feel safe. In spite of the progress F.N. has made in the case plan confected for her by DCFS, F.N. continues to show that she is not willing to put her children's needs ahead of her own. Although F.N. has participated in therapy and has completed some domestic violence classes, it is clear from her actions that she still has more to do with regard to showing significant measurable progress and correcting the conditions that originally required the removal of Mr.N. and Mk.N. from her custody. Considering the children's health, welfare, and safety, we find no manifest error in the juvenile court's judgment, granting guardianship of Mr.N. and Mk.N. to M.O., subject to visitation with F.N.

*Id.* at 751–52.

Similarly, in the present case, T.G. contends that she complied with her case plan. However, the record shows that the main goal of the case plan was to protect the children from M.G. It is clear from the review hearing reports provided by DCFS that M.G. was to be removed from the home. The trial court found that T.G. maintained consistent contact with M.G. throughout the case and until the time of trial. T.G. admitted that M.G. spends the night at her house. Based on the record and considering the children's health, welfare, and safety, we find no manifest error in the trial court's judgment, granting guardianship with subsidy of J.G., B.T., and Br.T. to their maternal grandmother, K.J., subject to visitation with T.G.

## DECREE

The judgment of the trial court, granting guardianship with subsidy of J.G., B.T., and Br.T. to their maternal grandmother, K.J., subject to visitation with T.G., is affirmed. All costs associated with this appeal are assessed against T.G.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.