# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 23-768

**STATE IN THE INTEREST OF
I. S.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC 2022-623
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## VAN H. KYZAR
## JUDGE

Court composed of Van H. Kyzar, Guy E. Bradberry, and Wilbur L. Stiles, Judges.

**REVERSED AND REMANDED.**

Lloyd Dangerfield
Indigent Defenders Office
P. O. Box 91908
Lafayette, LA. 70509-1908
(337) 896-3777
COUNSEL FOR OTHER APPELLANT:
        W. S. (father)

Annette F. Roach
CINC Appellate Project
2720 Rue de Jardin, Suite 100
Lake Charles, LA. 70605
(337) 436-2900
COUNSEL FOR OTHER APPELLANT:
        L. R. (mother)

James McKinley
Indigent Defenders Office
200 Moss Street
Lafayette, LA 70501
COUNSEL FOR OTHER APPELLANT:
        L. R. (mother)

Dinah S. Cain
Assistant Attorney General
Don Landry
District Attorney
P. O. Box 3306
Lafayette, LA 70502
(337) 232-5170
COUNSEL FOR OTHER APPELLEE:
        State of Louisiana

Franchesca L. Hamilton-Acker
Brittany Edwards
Acadiana Legal Services Corporation
P. O. Box 4823
Lafayette, LA 70502-4823
(337) 237-4320
COUNSEL FOR OTHER APPELLEE:
        I. S. (child)

CASA OF SOLA thru CASA CORDINATOR
P. O. Box 52033
Lafayette, LA 70505
(337) 268-5111
COUNSEL FOR OTHER APPELLEE:
        CASA OF SOLA

**Kelsy Mason**
**Ashley Taylor**
**Cassandra McAllister**
**Department of Children and Family Services**
**100 Asma Boulevard Suite 260**
**Lafayette, LA 70508**
**COUNSEL FOR OTHER APPELLEE:**
   **Department of Children and Family Services**

**KYZAR, Judge.**

The mother, L.R.[1], and the father, W.S., appeal the judgment of the trial court finding that guardianship of the minor child, I.S., should be granted to the paternal grandparents, C.S. and M.C. For the reasons that follow, we reverse the judgment and remand to the trial court.

## FACTS AND PROCEDURAL HISTORY

On June 22, 2022, the Department of Children and Family Services (DCFS) received a report which indicated that the minor child, I.S., age five, was severely malnourished, thin, and developmentally delayed. The child had not been seen by a physician since she was six months old and would need extensive therapy. According to the report, the child had been breast fed until the age of four, but no other food supplements had been given to the child. The child was still in diapers and had a leg condition that caused pain when she walked. The minor child was nonverbal, underdeveloped, and unable to walk. The mother, L.R., indicated to medical professionals that she had never taken the child to the hospital because she was afraid of giving the child vaccinations. L.R. also indicated that her mother had done the same with her when she was younger, making her extremely afraid of going to doctor's appointments.

I.S. was admitted to Women's and Children's Hospital on June 22, 2022, weighing twenty pounds. According to hospital personnel, her bloodwork indicated very severe vitamin D deficiency which could lead to a loss of bone density. It was determined through various tests that I.S. had multiple skeletal fractures. I.S. was also diagnosed with rickets, a rare disease that causes the bones to become soft and

---

[1] Pursuant to Uniform Rules–Courts of Appeal, Rule 5-2, the initials of the minor child, the parents and the grandparents are utilized thoughout to protect the identity of the minor.

bend. I.S.'s vitamin D levels were undetectable, and her calcium levels were extremely low, which would affect her walking and talking. According to the medical personnel, having extremely low calcium levels without obtaining medical attention could result in death. I.S. underwent surgery and had a feeding tube installed.

DCFS addressed concerns with I.S.'s parents about I.S. being malnourished and underdeveloped. L.R. indicated that she was terrified of taking I.S. to the doctor or hospital because she was afraid of getting into trouble due to the child being thin and not walking. L.R. stated that she has had concerns since I.S. was one year of age, but she chose not to take I.S. to the doctor, and instead she tried "at home" remedies of massages, special shoes, and even purchasing a harness to assist the child with walking.

L.R. stated that up until age four I.S. was given breast milk and jars of baby food. Between the ages of four and five, I.S. consumed mainly water, Cheez-It crackers, and occasionally fries. L.R. stated that it was easier to give I.S. jars of baby food because it was free, and she struggled financially.

W.S. indicated that I.S. saw a doctor when she was about four years old in New Iberia and the doctor informed them that I.S. was underweight and not on target. W.S. advised DCFS that I.S. drinks out of a bottle and still wears diapers. W.S. insisted that W. S.'s parents did not want them to seek medical attention for I.S.

According to additional information obtained by DCFS, L.R. had another child, age eight, that she lost custody of.

Following its investigation, DCFS felt it was in the best interest of I.S. to have the child placed in its custody. An instanter order for removal and provisional

2

custody to DCFS was signed on June 23, 2022. An adjudication hearing was set for August 22, 2022.

On July 8, 2022, L.R. and W.S. were arrested for second degree cruelty to a juvenile due to the severe malnutrition and neglect of I.S.[2]

On July 18, 2022, the State filed a Petition to Declare Child in Need of Care asserting I.S. was severely malnourished, underweight, and developmentally delayed. The child had not been treated by a pediatrician since she was around six months old, was still in diapers, non-verbal and unable to walk. It was asserted the child was a victim of abuse and neglect and in need of care.

During the August 22, 2022 hearing, the parents of I.S. stipulated that I.S. was in need of care and voluntarily consented to the judgment without admitting to the allegations of the petition. A judgment to this effect was signed on August 22, 2022, and a review hearing was set for November 9, 2022.

An October 25, 2022 DCFS court report indicated that the action steps for the parents were to, among other things, maintain safe housing, pay parental contribution toward the child's care in the amount of twenty-five dollars a month per parent, visit with I.S. regularly, attend all meetings and court hearings, maintain employment, submit to substance abuse and mental health evaluations, complete parenting classes, actively participate in I.S.'s medical appointments, and agree to a criminal records check. It was noted by DCFS that L.R. blamed her mother for L.R. not taking I.S. to the doctor even though she realized I.S. was not progressing in her development as she should because L.R.'s mother did not take her to a doctor when

---

[2] That case was pending throughout this litigation.

3

she was a child. L.R. further explained that her lack of parenting and overall care for I.S. was due in part to her unstable mental health, lack of energy, and laziness.

The report provided that both parents had been compliant with their action steps, even to the point of attending the child's medical appointments and being able to articulate certain aspects of her medical condition. However, DCFS, at the time, maintained concerns regarding the parents' abilities to safely and adequately ensure that the child's medical, physical, and emotional needs were met. Also, it noted that the parents failed to take responsibility for their failure to ensure the child's safety and overall well-being.

Family visits with the parents were supervised at the local DCFS office. Initially the quality of the visits was poor as the child would often gravitate to the DCFS workers rather than the parents. However, the most recent visits were more successful with the parents bringing toys for the child to play with and I.S. would hug and sit on both parents' laps. DCFS continued to recommend reunification as the permanent plan's goal.

During the November 9, 2022 permanency review hearing, the permanent plan was stated to be reunification. The parents were advised to achieve their case plan goals and correct the conditions that required the child to be in the care of DCFS. Both parents were ordered to undergo a mental/psychiatric assessment.

The December 19, 2022 DCFS court report reflected that both parents were determined to be compliant with their case plan. They had maintained adequate and safe housing, maintained employment, adhered to their substance abuse testing requirements, attended medical visits, and completed their parenting classes through the Extra Mile Resource Center. They had been referred to Extra Mile for a parent partner to increase their knowledge of being able to navigate through foster care

4

requirements and goals and to have a peer throughout the agency involvement. The parents were given hands-on instruction by the child's foster parent on how to feed the child with the G-tube and they appeared to understand the process. Although the parents were compliant with their case plan actions, the agency continued to have concerns regarding the parents' ability to ensure that the child's medical and physical needs would be met. Both parents verbalized an understanding that their inactions were the direct cause of I.S.'s medical deficiencies; however, they continued to state they should not have relied on W.S.'s parents for medical advice. Additionally, both parents felt their cultural upbringing contributed to their lapse in addressing I.S.'s medical needs. DCFS maintained its recommendation for reunification as the case goal.

The January 24, 2023 court report again provided that the parents were compliant with the action steps of their case plan. The drug screens were negative, except for prescribed medications. The parents had completed parenting classes and court-ordered psychological evaluations. The parents were referred for visitation coaching because they were having a difficult time engaging I.S. during their supervised visits because they often attempted to engage in activities that were above I.S.'s cognitive abilities. Although DCFS recommended reunification, the agency continued to express concerns regarding the parents' ability to safely and adequately ensure I.S.'s medical, physical, and emotional needs would be met. According to DCFS, the parents continued to believe I.S.'s lack of development and current medical diagnoses were not a direct cause of their failure to tend to her medical needs and they continued to not take full responsibility for their failure to ensure the child's safety and well-being initially.

5

A permanency hearing review was conducted on February 7, 2023. The order for this hearing provided that the parents were to continue to work on their case plan. The permanent placement plan for I.S. remained reunification, and the parents were advised that it was their responsibility to achieve the case plan goals and correct the conditions that required the child to be in need of care.

A psychiatric evaluation on the parents as ordered by the court was completed on January 11, 2023, with a follow-up assessment being completed on January 25, 2023. W.S. provided a history of being emotionally, verbally, and physically abused as a child by his father. He had no relationship with either of his parents at the time of the evaluation. He suspected his father was involved with the drug cartel in Columbia but had no proof.

Both parents emphasized that they wanted to get their daughter back and would do anything that was required of them to do so. They were hopeful the court would rule in their favor. They had taken I.S. to the pediatrician because she had not been eating well and had stopped walking. They knew that I.S. was developmentally delayed. L.R. admitted that her mother never took her to the doctor on a regular basis and that it was a learned cultural behavior pattern. W.S. did not believe in vaccinations. However, looking back, they reflected that they would have done things differently. The parents were able to visit I.S. under supervision every two weeks and felt the visits were going very well. They attended doctor visits with I.S. and have learned how to tube feed I.S. They stated they want to take care of I.S. and feel they are capable of providing the proper care for I.S. in the future if given the chance.

L.R. admitted she was accountable for her previous actions as a parent, and she tearfully stated she would do things differently and take I.S. to the doctor

6

anytime she sees the slightest thing wrong. L.R. admitted she was naïve and thought she was doing the best she could for I.S. and never intentionally or maliciously hurt I.S. She never wants to fail I.S. again and is praying for reunification.

W.S. stated they have a different outlook since completing the parenting classes. He admitted that if they had been bringing his daughter to the doctor regularly, they would have been educated on physical development and milestones, and he was very regretful about not taking her to the doctor. He and L.R. are committed to making sure I.S. is taken to the doctor for regular wellness checks and for any signs of illness. In hindsight, he reflected that he could have done a better job as a parent and now has a different attitude and outlook on parenting I.S.

The psychiatric mental health nurse practitioner noted L.R. was very ambitious to learn as much as she could about parenting and family dynamics. She exemplified strong perseverance. During the evaluations, L.R. was diagnosed with untreated ADHD and the nurse practitioner was of the opinion that L.R.'s untreated ADHD could very well have been a big contributing factor to L.R.'s poor parenting skills. If she had been treated properly, she would have had more organized thinking and been able to be more productive in all areas of her life. This treatment could easily be addressed in a future follow-up visit.

The psychiatric mental health nurse practitioner felt that W.S.'s lack of awareness and intelligence were contributing factors in his poor parenting skills. However, the parenting classes and research he and L.R. were doing had a positive impact on them both, and they were much more aware of protecting I.S. from unsafe conditions. The parenting classes have helped them tremendously, and they now realize how important it is to take their daughter to the doctor for wellness checks and when she gets sick. Their knowledge and awareness are now much better than

7

what was described in the collateral paperwork. They understand the stages of child development and milestones much better and realize the importance of meeting all of I.S.'s needs. It was felt that W.S., being a first-time father, and L.R.'s cultural background of reluctance to seek medical care were contributing factors. The mental health care practitioner related that the parents were not influenced by that way of thinking anymore, and both agree they would be proactive as parents and take care of I.S.

On February 13, 2023, I.S. was evaluated by Dr. Richard Howes, a specialist in Developmental Behavioral Pediatrics. Dr. Howes' report indicates that I.S. was normal at birth but had not seen a physician since. Her parents did not seek any medical attention due to fears of immunizations being given and then apparently being apprehensive over her general condition and repercussions from that. Dr. Howes' February 27, 2023 letter to DCFS and the trial judge indicated that I.S. was severely developmentally delayed and now has a diagnosis of autism. It was not possible to determine if the autism was due to an underlying genetic condition, but the severity of her malnutrition affected her brain growth and autism may be triggered by any insult to the brain. Dr. Howes stated, "It is unimaginable that the parents who would not seek care for a severely malnourished child who could not walk can manage her future complex needs." I.S. was to have a follow-up on or about March 13, 2023.

Dr. Howes' March 14, 2023 after-visit summary provides, "Regarding parental visitation; It is reported that [I.S.] is stressed by the visits with her parents. Since it is not likely that she will be reunited, I concur that visitations should be stopped."

8

A DCFS family team meeting was held on April 10, 2023, which resulted in an April 18, 2023 court report. During this meeting, it was noted the parents had been compliant with all of their case plan goals. L.R. had been diagnosed with ADHD and prescribed medication. The parenting and coaching services had been terminated because during the March 6, 2023 staffing with The Extra Mile it was recommended that all family visits should be suspended due to the child displaying trauma response in the presence of the parents during the visits. Following this April meeting, DCFS changed the permanency goal from reunification to adoption.

During the Permanency Hearing on May 2, 2023, the April 10, 2023 case plan was approved. This case plan indicated both parents were employed, and both passed their drug screens. They had completed their parenting classes. DCFS recommended changing the permanency plan to adoption from reunification and the court ordered that the permanency plan be changed accordingly, although the court ordered that the visitation schedule would not change.

The court report of August 2, 2023, provided that I.S. was placed in the paternal grandparents' home in New York as of August 1, 2023, and future visits with the parents were to be conducted virtually due to the location of the child. Adoption was still listed as the recommended permanent placement plan goal.

A permanency hearing was held on August 15, 2023. The order following this hearing provided that the permanent plan for I.S. was reunification and that DCFS had made reasonable efforts to reunify the child and the parents, or to finalize the child's placement in an alternative safe and permanent home. Visitation for the child with the parents and her grandparents had been coordinated.

9

The October 4, 2023 case planning meeting noted that the parents maintained video calls via zoom with the child since she was living with the grandparents out of state. The parents had been compliant with the case plan, both were employed, and both parents were prescribed medication for their ADHD. DCFS indicated that although the parents had been compliant with the action steps of their case plan, the agency continued to have concerns regarding the parents' abilities to safely and adequately ensure that the child's medical, physical, and emotional needs would be met. DCFS noted that the parents believe the child's lack of development and current medical diagnoses are not a direct cause of their failure to tend to her medical needs and have continued to not take responsibility for their failure to ensure her safety and overall well-being. DCFS recommended guardianship for I.S.

A permanency hearing review was held on October 24, 2023, following which the court signed an order that the permanent plan of guardianship was most appropriate, in the best interest for I.S., and that out-of-state placement with the paternal grandparents, C.S. and M.C., "is safe, appropriate, and in the child's best interest."

On November 6, 2023, the court signed a Permanency Hearing/Guardianship Order, where the court again held that guardianship with the paternal grandparents was the most appropriate permanent placement plan for I.S. and was in her best interest. The order also indicated that the court retained jurisdiction to enforce, modify, or terminate the order of guardianship until the child reached the age of eighteen.

Both L.R. and W.S. have appealed the trial court's October 24, 2023, and November 6, 2023 orders. L.R. asserts the following assignment of errors:

10

1. The trial court was manifestly erroneous in finding that the evidence presented in the case was sufficient to find reunification of the child with her mother was not a viable alternative in the case.

2. The trial court was manifestly erroneous in finding that guardianship was in the best interest of the child, and, further, that the paternal grandparents were appropriate guardians for the child.

3. The trial court erred in concluding that it did not have authority to require that the guardians permit L.R. to have visitation with I.S.

W.S. asserts the following assignment of errors:

1. The trial court erred in granting guardianship when DCFS failed to demonstrate that reunification was not a viable option considering the total compliance of the parents.

2. The trial court erred in granting guardianship when DCFS failed to prove by clear and convincing evidence the codal requirements for guardianship.

3. The trial court erred in not setting forth a visitation plan and in not restricting the guardians' ability to move out of the U.S. without prior notice.

## OPINION

*The Grant of Guardianship Rather than Reunification*

Both parents assert it was error for the court not to find that reunification of the child with the parents was a viable option, but instead granted guardianship to the paternal grandparents. Despite the significance of this case for the child, and for the parents, DCFS did not file a brief in response to this appeal.

In discussing the scope of appellate review in a juvenile court proceeding, this court in *State in the Interest of P.P.*, 23-38, p. 9 (La.App. 3 Cir. 6/21/23), 368 So.3d 250, 256 explained:

> Appellate courts review a juvenile court's findings of fact under the manifest error standard of review and cannot set aside such findings of fact in the absence of manifest error or unless those findings are clearly wrong. *In re A.J.F.*, 00-948 (La. 6/30/00), 764 So.2d 47. Great deference is owed to the findings of the juvenile courts. *Id.* In *State ex*

11

*rel. D.H.*, 04–2105, pp. 7-8 (La.App. 1 Cir. 2/11/05), 906 So.2d 554, 560, the first circuit noted:

> [I]t is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. [*In re A.J.F.*, 764 So.2d 47.] Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. *Id.*; *see Rosell v. ESCO*, 549 So.2d 840 (La.1989). If the juvenile court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.*; *see Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 2001-2217 (La. 4/3/02), 816 So.2d 270.
>
> In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and if such a basis does exist, (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. *See Stobart v. State, through DOTD*, 617 So.2d 880 (La.1993). If there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. *Id.*

In *State in the Interest of M.N.*, 23-174, p. 7–8 (La.App. 1 Cir. 6/23/23), 370 So.3d 744, 748–49, *writ denied*, 23-947 (La. 9/6/23), 369 So.3d 1269, the court discussed the implementation of a permanent plan for a child in need of care and stated:

> The court must determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with certain priorities of placement, guardianship being below reunification and adoption. La.Ch.Code art. 702(C). In most permanent plan determinations, the court is required to determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health, welfare, and safety is the paramount concern in the court's determination of the permanent plan. La.Ch.Code art. 702(E). More

than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. **State in Interest of K.P.**, 51,853 (La.App. 2 Cir. 11/15/17), 246 So.3d 627,634.

. . . .

In order for reunification to remain the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care. La.Ch.Code art. 702(C)(1); **State in Interest of K.P.**, 246 So.3d at 635. Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the State to remove the children from the parent's care and custody. **State in Interest of N.L.**, 54,429 (La. App. 2 Cir. 3/30/22), 335 So.3d 1018, 1023.

To reverse a juvenile court's permanency plan determination, an appellate court must find from the record that the juvenile court's finding is clearly wrong or manifestly erroneous. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. *Id.*

Not until the October 24, 2023 permanency hearing did Ashley Taylor, the child's case manager, testify that DCFS wanted to change the case goal to guardianship from reunification. Ms. Taylor admitted the parents had been compliant with the plan goals. It was noted that the parents were opposed to granting guardianship to the grandparents. Up until that time, the goal had always been reunification, except for once when it was changed to adoption, but again at the next hearing changed back to reunification.

Cassandra McAllister, the parents' agency worker, also agreed the parents had been compliant with their case plan. Regarding providing guardianship to the paternal grandparents, Ms. McAllister admitted that the parents were opposed to it.

In the questioning of Ms. McAllister as to whether there was anything that the parents could do to regain custody of I.S., the following colloquy occurs:

Q. Well, as far as it relates to the case plan.

A. That's an agency question. Based on-- based on the professional collaterals, no. Based on professional collaterals that have indicated, such as Dr. Howes, the doctor with Extra Mile, their concerns, our concerns that were still how this child ended up in this situation, lack of medical care.

Q. Does the agency have a plan on how to address those professional collateral concerns?

A. They were addressed when we attempted to do the parenting, the visiting, those things were addressed. As far as the professional, the medical, that's being addressed now.

. . . .

Q. Is there nothing that can be done to address those concerns for the parents?

A. So the agency still has concerns as to how the child ended in this situation without medical treatment for such a long time, so that's the concern.

Q. Right. And that's what I'm asking. Is there something to address those concerns?

A. No. No.

In granting guardianship to the paternal grandparents, the judge stated:

Everybody knows what happened. I have -- and it is what it is. So the parents have worked the case plan; I have never seen a child in the condition that this child was in, in the 31 years that I have done the work that I'm doing. I will never be able to return this child to their parents. Can't happen. Won't happen in this court. Dr. Howes indicated that it should not happen; so did the doctor from Extra Mile. I don't believe that the trauma inflicted on this child can change by changing your life. It might change your life, and hopefully it has. And hopefully you all have had an opportunity to soul search to figure out what happened, but I do not believe this child should ever be reunited with parents who have committed the trauma that you guys did to -- that's -- I can't change my feelings and my belief. And I believe that rather than terminating your parental rights, I think guardianship -- because I would do that. The next step would be to terminate your parental rights, and I would do that based on what I know that happened to this child and what the doctors have said. But instead of doing that, the option of granting guardianship to a paternal -- to a, grandparent, to me, is an option that is in the best interest of this child. And so today the Court is going to grant guardianship to the paternal grandparents at this time.

14

This court in *State in the Interest of I.A.*, 18-641(La.App. 3 Cir. 4/3/19), 269 So.3d 881, affirmed the trial court's determination that the case plan goal should be changed from reunification to adoption because it was determined the mother was not capable of parenting and was not in compliance with her case plan. In discussing the permanent disposition of child in need of care cases, this court stated:

> The permanent disposition of CINC cases by hearing is governed by La.Ch.Code art. 702, which provides, in pertinent part:
>
>> B. The court shall conduct a permanency hearing within nine months after the disposition hearing if the child was removed prior to disposition or within twelve months if the child was removed at disposition, but in no case more than twelve months after the removal. Permanency reviews shall continue to be held at least once every twelve months thereafter until the child is permanently placed or earlier upon motion of a party for good cause shown or on the court's own motion.
>>
>> C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
>>
>>> (1) Return the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.
>>>
>>> (2) Adoption.
>>>
>>> (3) Placement with a legal guardian.
>>>
>>> (4) Placement in the legal custody of a relative who is willing and able to offer a safe, wholesome, and stable home for the child.

15

[. . . .]

We note specifically the language in paragraph (C)(1), which requires that the parent be "complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care." While Article 702 establishes a priority of placement, and the main priority is reunification, plan compliance and significant progress are prerequisites to its consideration. As our colleagues on the second circuit stated:

> Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the state to remove the children from the parent's care and custody. Stability in the home environment and relationships is a consideration in the permanency plan determination. A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated.

> *State in Interest of E.M.*, 51,511, p. 10 (La.App. 2 Cir. 6/2/17), 224 So.3d 1122, 1128.

*Id.* at 884–85.

Contrary to the parent in *State in the Interest of I.A.*, L.R. and W.S. have fulfilled every requirement of their case plan. They completed parenting classes, regularly visited I.S., obtained employment, attended psychological evaluations, learned how to properly tube feed I.S., and attended I.S.'s medical appointments.

DCFS consistently listed the plan goal of reunification until the April 18, 2023 court report recommended a change of the plan goal to adoption. This report noted that the parenting and coaching services had been terminated because during the March 6, 2023 staffing with The Extra Mile it was recommended that all family visits should be suspended due to the child displaying trauma response in the presence of the parents during the visits. The staffing included a visiting coaching psychologist consultant from Tulane, the clinical supervisor, and the program

16

director. The consultant, only after listening to the staff's observation of the family visits and without personally observing the visitations, expressed "that it is harmful, unsafe, and triggering to allow visits to continue between minor child and parents."

Contrary to these conclusions that the family visits were harmful and unsafe for I.S., the most recent visitation report on March 1, 2023 documented that the parents appeared to be excited to see the child and the child appeared to be happy. The child had a smile on her face. Although the child's initial reaction was withdrawn, the child ultimately was running around the table smiling and laughing with the parents. The parents displayed affection toward the child by picking her up and hugging and kissing her. The parents threw balls back and forth to each other while the child would run back and forth and attempt to grab the ball. It was noted the child was having fun by laughing, smiling, and continuing to play. The mother combed the child's hair. It was observed that the parents appropriately engaged with the child. Although the child did not cry or scream during the entire visit, and it appeared the child was having fun, the worker indicated that the child appeared to display a lack of trust or safety during the visit by continuously going to the same location of the room next to the window behind the table. It should be noted however, that Dr. Howes' February 13, 2023 report indicates that I.S. does not seem to bond to anyone.

The Tulane consultant that made the recommendation to terminate the family visits did not testify during any of the hearings, and it appears the consultant never actually observed any family visits, but rather based his opinion on what was told to him by the Extra Mile staff.

The trial judge also referenced Dr. Howes in his oral ruling. Dr. Howes' March 14, 2023 after-visit summary provided, "Regarding parental visitation; It is

17

reported that [I.S.] is stressed by the visits with her parents. Since it is not likely that she will be reunited, I concur that visitations should be stopped." Once again, this recommendation about parental visitation was based on what Dr. Howes was told and not what he observed. It further fails to mention or take into consideration the March 1, 2023 report of the visitation reflecting favorable interaction between the child and the parents.

The main issue DCFS had with the parents was that the parents did not take responsibility for I.S.'s condition. The parents' attorneys asserted the reason for the reluctance of the parents to admit their fault to DCFS was the criminal charges pending against them for second degree cruelty. The psychiatric evaluation reports, however, indicated that both parents were very remorseful about not properly feeding I.S. and ensuring she had proper medical treatment. The psychiatric nurse practitioner noted that L.R. tearfully stated she would do things differently and take I.S. to the doctor anytime she sees the slightest thing wrong. L.R. admitted she was naïve and thought she was doing the best she could for I.S. and never intentionally or maliciously hurt I.S. She never wants to fail I.S. again and is praying for reunification.

The psychiatric nurse practitioner concluded that L.R.'s lack of awareness and intelligence were contributing factors to her failure to properly care for I.S., but that the parenting classes and all the research L.R. had been doing on her own have had a positive impact on her. L.R.'s knowledge and awareness are now much better than what was described in the collateral paperwork. She understands the stages of child development and milestones much better and realizes the importance of meeting all of I.S.'s needs. The psychiatric nurse practitioner also stated that L.R.'s untreated ADHD could very well have been a big contributing factor to L.R.'s poor parenting

skills at the time. If L.R. had been treated properly for her ADHD, she would have had more organized thinking ability and would have been able to be more productive in all areas of her life. L.R. is now taking medication for her ADHD as recommended.

Regarding W.S., he informed the psychiatric nurse practitioner that in the past they would not bring I.S. to the doctor on a regular basis unless they noticed she was sick. He did not believe in vaccinations. W.S. stated they have a different outlook since completing the parenting classes. He admitted that if they had been bringing his daughter to the doctor regularly, they would have been educated about physical development and milestones. W.S. was very regretful they did not take I.S. to the doctor regularly. He and L.R. are committed to making sure I.S. is taken to the doctor for regular wellness checks and for any signs of illness. In hindsight, W.S. admitted he could have done a better job as a parent and now has a different attitude and outlook on parenting I.S. The psychiatric nurse practitioner felt that after the parenting classes W.S. is much more aware of protecting I.S. from unsafe conditions. The nurse practitioner believed that W.S. being a first-time father and L.R.'s cultural background of not being taken to a doctor were also contributing factors. They are not influenced by that way of thinking anymore because both W.S. and L.R. agree they will be proactive as parents and take care of I.S.

It was not until May 2, 2023, that the permanency goal plan was changed from reunification to adoption. Thereafter, it was changed back to reunification. Then on October 24, 2023, it was felt that reunification was not a viable option, and that guardianship should be given to the paternal grandparents. Up until this time, the goal had always been reunification, other than the May 2 plan goal. There had been no change in the parents' efforts to do everything they could to get I.S. back and to

19

rectify the conditions that caused I.R. to be removed from their custody. There was no finding that the parents failed to substantially comply with the case plans developed to address the issues that led to the removal of I.S. from their home. There was no evidence presented by the State that "professional collaterals" had expressed concerns about how the child ended up in the custody of the State other than the report of Dr. Howes. The only fact-based evidence presented by the State was that the parents continued to be compliant in meeting their case goals, wanted desperately to be reunited with their child, and desired to be given a chance to put their newfound knowledge of parenting skills to work.

It is clear that regardless of the time and effort the parents put forth over the many months to rectify the issues that resulted in the removal of I.S., the court based its decision almost wholly on what originally happened to I.S., not how the parents had changed or had addressed the issues that led to I.S. being taken from them.

In *State in Interest of P.B.*, 49,668, pp. 9–10 (La.App. 2 Cir. 12/17/14), 154 So.3d 806, 812–13, the second circuit stated:

> In the context of both termination of parental rights and evaluation of permanency plans, the courts have used a reformation test to determine if a plan of reunification is consistent with the best interest and special needs of a child. *State ex rel. S.D. [v. D.M.D.B.*, 36,406 (La.App. 2d Cir. 8/14/02)], *supra.* This test evaluates whether there is an expectation of reformation of a parent's conduct and indicates that no such expectation exists when the parent exhibits prolonged and consistent abusive or negligent behavior or a long history of substance abuse. Conduct such as behavioral or mental disorders which cause a parent to refuse to cooperate with the authorities in addressing the needs of the child would also suggest that no reasonable expectation of reformation exists and that it is unlikely that the parent will reform. *Id.* However, a reasonable expectation of reformation is found to exist if the parent has cooperated with the state officials and has shown improvement, although all of the problems that exist have not been eliminated. *State in the Interest of S.M., supra; State in the Interest of L.L.Z. v. M.Y.S.,* 620 So.2d 1309 (La.1993).

20

There was no evidence presented during the hearings to prove that the parents were not making significant improvements in their parenting knowledge and skills, or that they were unwilling or unable to meet the goals placed on them by DCFS as adopted by the court. There was no evidence presented by DCFS nor any finding that reunification was not feasible at the present or in the immediate future. To the contrary, the testimony established that the parents were compliant and had continued to be compliant with the case plan.

Louisiana Children's Code Article 702 (C) establishes a priority of placement, with reunification being the main priority, provided there is plan compliance and significant progress by the parents. The court must assess whether the parents have exhibited significant improvement in the particulars that caused the State to remove the child from their custody. *See State in Interest of I.A.*, 269 So.3d 881. The psychological evaluations indicated the parents have exhibited significant improvement. Both parents are taking medication for their ADHD. The psychological assessments provided that the parents have learned significantly from their parenting classes and are much more aware of what they need to do to protect I.S. The psychological assessment establishes that the parents have made significant and substantial reformation which should continue to justify a plan of reunification at the present.

In discussing guardianship, the court in *State in Interest of N.L.*, 54,429, pp. 9–11 (La.App. 2 Cir. 3/30/22), 335 So.3d 1018, 1022–23, stated:

> The purpose of guardianship is to provide a permanent placement for children when neither reunification with a parent nor adoption has been found to be in their best interest; to encourage stability and permanence in the lives of children who have been adjudicated to be in need of care and have been removed from the custody of their parent; and to increase the opportunities for the prompt permanent placement of children, especially with relatives, without ongoing supervision by

21

the department. La. Ch. C. art. 718(A). It is intended to ensure that the fundamental needs of children are met and the constitutional rights of all parties are recognized and enforced. La. Ch. C. art. 718(B).

The court must determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with certain priorities of placement, guardianship being below reunification and adoption. La.Ch.C. art. 702(C). In most permanent plan determinations, the court is required to determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health and safety is the paramount concern in the court's determination of the permanent plan. La. Ch. C. art. 702(E); *State in Int. of K.P.*, 51,853 (La. App. 2 Cir. 11/15/17), 246 So. 3d 627. More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. *State in Int. of D.E.*, 52,305 (La. App. 2 Cir. 8/15/18), 253 So. 3d 877; *State in Int. of K.P., supra.*

After a child has been adjudicated to be in need of care, the department may submit a case plan along with the case review report to the court and all counsel of record recommending guardianship. La. Ch.C. art. 720. According to La.Ch.C. art. 722(A), a mover for guardianship shall have the burden of proving all of the following by clear and convincing evidence:

(1) The child has been adjudicated to be in need of care.

(2) Neither adoption nor reunification with a parent is in the best interest of the child.

(3) The child has resided for at least six months with the proposed guardian, unless the court waives the residence requirement for good cause.

(4) The proposed guardian is able to provide a safe, stable, and wholesome home for the child for the duration of minority.

As noted above, guardianship is below reunification in the priorities of placement, and guardianship should only be considered when it is determined that reunification is not in the best interest of the child. Here, there was no clear and convincing proof offered by DCFS to support a finding by the trial court that reunification was not in the best interest of the child, only the statement that the trial

22

court was never going to consider reunification. There was no evidence presented by the State at the hearing to justify changing the permanency goal from reunification to guardianship. The court continuously accepted reunification as the plan's goal until March 2023, when the Tulane consultant suggested that the family visits should be terminated, despite having not personally observed the actual visitations, and Dr. Howes, on learning of the Tulane consultant's recommendation, also agreed, although he did not personally observe such, either. All the while, the parents were continuously told that if they achieved the plan's goal, then they would be reunited with I.S. "[A] reasonable expectation of reformation is found to exist if the parent has cooperated with the state officials and has shown improvement, although all of the problems that exist have not been eliminated." *State in Interest of P.B.*, 154 So.3d at 813. Here the parents cooperated with the state officials and showed vast improvement.

In addition, while it was established from the record that the child had been declared a child in need of care and removed from custody as required by La.Ch. Code art. 722(A)(1), there was no clear and convincing proof submitted at the hearing that "[t]he child has resided for at least six months with the proposed guardian". There was no waiver of that "residence requirement for good cause[,]" and there was no clear and convincing proof at the hearing that "[t]he proposed guardian is able to provide a stable and safe home for the child for the duration of minority[,]" all as required by La.Ch.Code art. 722(A)(2),(3), and (4). This is especially pertinent considering the lack of evidence at the permanency hearing as to the ability and stability of the guardians considering the earlier report of the mental health nurse practitioner detailing information from W.S. that both he and his brother had been emotionally, verbally, and physically abused as children and his concerns

23

over his father's possible ties to the drug cartels. There is further no evidence in this record of why the grandparents apparently took no interest in the child in all the time leading up to the initial removal given W.S.'s statements during his psychiatric exam in January 2023 that he had no relationship with them up to that time. In the absence of such evidence by DCFS, we find the trial court erred in granting guardianship to the paternal grandparents in New York at this time.

While we take cognizance of the difficult decision to be made by the trial court in cases such as this, we also consider that DCFS has an obligation to establish the facts to support such decisions by clear and convincing evidence. It did not do so here. There was insufficient evidence presented as to whether reunification was or was not in the best interest of the child, or that guardianship by the paternal grandparents at this time was or was not in the child's best interest. Accordingly, we reverse the judgment for guardianship to the paternal grandparents, and remand to the trial court with instructions that DCFS continue with the necessary steps for potential reunification, if possible, and further proceedings consistent therewith.

*Failure of the Trial Court to Establish a Visitation Schedule.*

The third assignment of error asserted by the parents involves the failure of the trial court to set the frequency and nature of the visitation between I.S. and her parents in the guardianship order, in violation of La.Ch.Code. art. 723(B). In that we have determined that the guardianship should be set aside, we need not address this assignment of error.

## DECREE

For the foregoing reasons, the judgment of the trial court granting guardianship of I.S. to the paternal grandparents, C.S. and M.C., is reversed, and this matter is remanded to the trial court for further proceedings consistent herewith, with

24

custody of the child to remain with the State pending further orders of the trial court.

Court costs are assessed against the DCFS in the amount of $2,371.25 pursuant to

La.R.S. 13:5112.

**REVERSED AND REMANDED.**

25